17 F.3d 1478
 305 U.S.App.D.C. 125
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, Petitioner,
v.
Federico F. PENA, Secretary of Transportation, and Rodney
Slater, Administrator, Federal Highway
Administration, Respondents.
 No. 92-1413.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 2, 1993.
Decided March 15, 1994.
 
 Petition for Review of an Order of the Federal Highway Administration, U.S. Department of Transportation.
 Paul H. Lamboley, Washington, DC, argued the cause for petitioner. With him on the briefs was Stephen Presser.
 John P. Schnitker, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for respondents. With him on the brief was Michael Jay Singer, Atty., U.S. Dept. of Justice.
 Before MIKVA, Chief Judge, WILLIAMS and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 On November 21, 1991, then-Secretary of Transportation Samuel Skinner, acting on behalf of the United States, entered into a Memorandum of Understanding with his Mexican counterpart. Each country agreed that as of April 1, 1992, it would require commercial drivers licensed pursuant to its authority to pass drivers' tests meeting the standards specified in an annex to the Memorandum of Understanding; in addition, each country would recognize commercial drivers' licenses ("CDLs") that the other country issued in compliance with their agreement. The United States Federal Highway Administration ("FHWA") later promulgated a rule implementing this accord. 57 Fed.Reg. 31,454 (July 16, 1992) (the "Implementing Rule").
 
 
 2
 Recognition of foreign CDLs had been presaged by FHWA regulations implementing the "single-license requirement" of the Commercial Motor Vehicle Safety Act of 1986 (the "Safety Act"), 49 U.S.C. app. Secs. 2701 et seq. Because a truck driver with licenses from many different jurisdictions might be able to maintain the appearance of a good driving record despite many violations, the Safety Act prohibited operators of commercial motor vehicles from having more than one license. Id. Sec. 2701. Under penalty of loss of highway funds, the Safety Act also encouraged each state to issue CDLs only to people domiciled in that state, with one exception: states could issue nonresident licenses to people who were not domiciled in a state that issues CDLs. Id. Sec. 2708(a)(12). Later the FHWA made clear that states could grant these nonresident CDLs to people domiciled in foreign jurisdictions that fail to impose CDL standards "in accordance with, or similar to" the minimum standards imposed by the FHWA on American states. 49 CFR Sec. 383.23(b). The implication of this regulatory scheme is that when a foreign country's CDL standards are "in accordance with, or similar to," the federal standards, CDLs issued by that country will be valid in America. Otherwise, drivers from foreign nations with non-complying standards would be able to secure a state nonresident CDL, while drivers from complying nations would be completely barred from our highways.
 
 
 3
 In 1988, pursuant to an agreement between Canada and the United States, the FHWA determined that Canadian CDL standards met this test and inserted a footnote to that effect in 49 CFR Sec. 383.23(b). This action went unchallenged. But when the FHWA adopted the Implementing Rule, adding a sentence to the footnote to implement the Memorandum of Understanding between the United States and Mexico, the International Brotherhood of Teamsters brought this petition for review. The Teamsters do not challenge the underlying regulatory system, but insist that Mexico's CDL standards are not "similar to" the federally established ones, and that the Implementing Rule violates the Administrative Procedure Act, 5 U.S.C. Secs. 551 et seq.; the Trade Act of 1974, 19 U.S.C. Secs. 2112, 2191; the Omnibus Trade and Competitiveness Act of 1988, 19 U.S.C. Secs. 2901-02; and the Safety Act. We reject their arguments.
 
 I. Subject-Matter Jurisdiction
 
 4
 Though the parties have not contested our subject-matter jurisdiction, we must independently satisfy ourselves that it exists. Unless a statute provides otherwise, persons seeking review of agency action go first to district court rather than to a court of appeals. See 5 U.S.C. Sec. 703. But Congress has overridden the normal default rule here.
 
 
 5
 When the Department of Transportation was created in 1966, Congress transferred authority to it from a variety of different agencies. Pub.L. No. 89-670, Sec. 6, 80 Stat. 937-41 (Oct. 15, 1966), codified at 49 U.S.C. app. Sec. 1655. The Department's exercise of these transferred "functions, powers, and duties" is subject to judicial review "to the same extent and in the same manner" as if the functions in question were still being exercised by the agency from which they were transferred in 1966. See 49 U.S.C. app. Sec. 1653(c). One of the authorities that the FHWA purported to exercise here--the authority to "prescribe requirements for qualifications ... of employees of, and safety of operation ... of" motor carriers and motor private carriers, see 49 U.S.C. Sec. 3102(b); see also the Implementing Rule, 57 Fed.Reg. at 31,457/3 (invoking 49 U.S.C. Sec. 3102(b))--was among the authorities transferred from the Interstate Commerce Commission in 1966. See 49 U.S.C. Sec. 304(a)(1)-(3) (1964) (ICC's old authority); Pub.L. No. 89-670, Sec. 6(e)(6)(C) (transferring this authority). The courts of appeals have exclusive jurisdiction to hear challenges to ICC rules. 28 U.S.C. Sec. 2342(5). Accordingly, when the Secretary exercises the Sec. 3102(b) authority (or when the FHWA does so on the Secretary's behalf, see 49 U.S.C. Sec. 104(c)(2); 49 CFR Sec. 1.48(f)), review lies in the courts of appeals. Center for Auto Safety v. Skinner, 936 F.2d 1315 (D.C.Cir.1991).
 
 
 6
 Here, however, the FHWA relied not only on the Secretary's powers under Sec. 3102(b), but also on the Secretary's powers under the Safety Act. See 49 U.S.C. Sec. 104(c)(3); 49 CFR Sec. 1.48(v). Conceivably the court of appeals--the proper forum to review rules issued exclusively under the former authority--is not the proper forum to review rules issued exclusively under the latter authority; the ICC never exercised Safety Act powers for the simple reason that they were not created until 20 years after the 1966 transfer, at which point they were vested in the Secretary. Cf. Owner-Operator Independent Drivers Ass'n v. Pena, 996 F.2d 338, 340-41 (D.C.Cir.1993) (holding that courts of appeals lack original jurisdiction to review the FHWA's exercise of grant-making authority derived from statutes passed in 1991 and 1983). But regardless of whether jurisdiction to review regulations issued exclusively under the Safety Act would lie in the district court,[1] the FHWA's explicit reliance on both the Safety Act and Sec. 3102 gives us jurisdiction over this petition.
 
 
 7
 There are at least four possible treatments of these dual authority cases: no review anywhere, review only in the district court, review only in the court of appeals, or review in either at the challenger's option. The first seems clearly ruled out by common sense and the presumption in favor of reviewability. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Moreover, the second possibility collapses into the first: if we lack jurisdiction over this petition because the district court has exclusive original jurisdiction to review rules issued under the Safety Act, then the district court would also lack jurisdiction over this petition because we have exclusive original jurisdiction to review rules issued under Sec. 3102. In other words, the only logic that could lead to the second possibility actually ends up leading to total nonreviewability--a possibility that we have already discarded. On the other hand, even if district court jurisdiction was precluded by our exclusive original jurisdiction over actions taken under Sec. 3102, the converse wouldn't necessarily follow: as we have clear appellate jurisdiction even where the district court has exclusive original jurisdiction, the interests of assuring a forum capable of treating the case coherently might justify the comparatively modest displacement of the district court. In any event, as petitioners sought review here, we need not decide whether our jurisdiction is concurrent or exclusive. Cf. Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 192-93 (7th Cir.1986) (where a single decision encompasses four "orders", three issued under authority leading to exclusive jurisdiction in the court of appeals, and the fourth leading to review initially in the district court, entire proceeding is to be reviewed in court of appeals); Media Access Project v. FCC, 883 F.2d 1063, 1066-69 (D.C.Cir.1989).
 
 II. Standing
 
 8
 The fact that we have jurisdiction over the subject matter of this case does not necessarily mean that the petitioner, a labor organization that represents many commercial truck drivers in America, has standing to invoke it. To have standing under Article III of the Constitution, the petitioner must point to some "injury in fact" that the Implementing Rule inflicts on its members. See Lujan v. Defenders of Wildlife, --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (describing "the irreducible constitutional minimum of standing"); Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977) (setting out requirements for associations to have standing). The petitioner seeks to satisfy this requirement by arguing that the FHWA's action unleashes Mexican drivers on American roads even though they would not qualify for American CDLs. The Teamsters assert that they will suffer both from the extra competition and from a possible increase in the number of truck accidents; in their view, the Implementing Rule threatens both their pocketbooks and their safety.
 
 
 9
 Nonsense, responds the government. Regardless of whether Mexican CDLs are recognized throughout the United States, a moratorium in effect since 1980 restricts drivers for Mexican trucking companies to specified border zones. See 49 U.S.C. Sec. 10922(l ). The government argues that Mexican drivers therefore pose no safety hazard on American roads and are not competing with American drivers for the same routes.
 
 
 10
 This conclusion does not follow. If the union is right on the merits, the Implementing Rule at least makes highways within the border zones less safe. See Letter from T.D. Larson to Paul Lamboley (Oct. 29, 1992) at 2, in Petitioner's Appendix (noting that without Memorandum of Understanding Mexican drivers would need American CDLs to operate in border zones). In any event, it seems improper to focus only on the border zones. The current moratorium applies only to Mexican companies, not to Mexican drivers who work for American companies or independently; the Implementing Rule relieves such drivers of the need to secure American CDLs. Under the North American Free Trade Agreement, moreover, each country's companies will eventually be able to perform hauls between any point in Mexico and any point in America (though point-to-point transportation within each country will remain restricted to the trucking companies of that country). Though the scale of the Implementing Rule's effect may not be clear, its direction is: easing the criteria for Mexican nationals driving here seems sure to increase their number.
 
 
 11
 Focusing on the union's claims about highway safety, the government protests that these claims--even if true--would merely establish an injury that the union's members share with everyone who uses the highways. Of course, the injury alleged by the union is far more concrete than the sorts of "generalized grievances" found insufficient to confer standing in United States v. Richardson, 418 U.S. 166, 180, 94 S.Ct. 2940, 2948, 41 L.Ed.2d 678 (1974), and Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974). Since the union has adequately alleged a concrete injury, there appears to be no constitutional bar to standing, even if every inhabitant of the country suffers the same concrete injury. See United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973); cf. Defenders of Wildlife, --- U.S. at ---- - ----, 112 S.Ct. at 2142-46, 119 L.Ed.2d 351. But we need not address this point, because the union's members spend far more time on the roads than most other Americans. Reductions in highway safety would cause more harm to them than to typical members of the public at large, and so the injury is not "common to all members of the public". Cf. Richardson, 418 U.S. at 178, 94 S.Ct. at 2954 (quoting Ex parte Levitt, 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937)).
 
 
 12
 While we see no constitutional bar to standing, we still must ask whether the petitioner has satisfied "prudential" standing requirements, i.e., shown that the interest it seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question". Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); see also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 886, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990); Clarke v. Securities Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). The union's interest in highway safety is indisputably one that the Safety Act and 49 U.S.C. Sec. 3102(b) seek to advance, and so the union plainly has standing to object that the Implementing Rule violates the substantive requirements of the Safety Act.
 
 
 13
 As for the union's insistence that the Implementing Rule is invalid because it was promulgated without notice and comment, the petitioner may assert violations of any procedures "designed to protect [the] threatened concrete interest of his that is the basis of his standing." Defenders of Wildlife, U.S. at ---- n. 8, 112 S.Ct. at 2143 n. 8. Standing to assert procedural protections is thus derivative; a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority, at least if the procedure is intended to enhance the quality of the substantive decision. Of course, a procedure might be aimed simply at giving some special class of persons a voice, in which case the interests of persons not in that class might be "so marginally related to or inconsistent with the purposes implicit in the [requirement] that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke, 479 U.S. at 399, 107 S.Ct. at 757. But the notice-and-comment provisions invoked by petitioner are not directed to any such parochial goal.
 
 
 14
 For the same reason, we think that the petitioner has standing to contend that the Implementing Rule is invalid because the underlying Memorandum of Understanding was never endorsed by Congress in accordance with the procedures established by the trade acts. The procedural requirement that trade agreements be subject to Congress's approval presumably was designed to let Congress double check the balance that the executive's trade negotiators strike between interests of the sort that the union advances and countervailing considerations, such as consumer interests in lower-priced products. Indeed, Congress specifically identified both employment opportunity and safety as domestic objectives that the executive's trade negotiators should take into account. 19 U.S.C. Sec. 2901(b)(9)(B).
 
 III. The Merits
 A. Commercial Motor Vehicle Safety Act
 
 15
 Turning to the merits, we first address the union's contention that the Implementing Rule violates the Safety Act. That Act requires the Secretary to "issue regulations to establish minimum Federal standards for testing and ensuring the fitness of persons who operate commercial motor vehicles"; it also sets a number of threshold standards that these regulations must meet. 49 U.S.C. app. Sec. 2704(a). With an exception not relevant here, the Safety Act then forbids anyone from operating a commercial motor vehicle "unless such person has taken and passed a written and driving test to operate such vehicle which meets the minimum Federal standards established by the Secretary under [Sec. 2704(a) ]". Id. Sec. 2704(b)(1). According to the union, the standards required for issuance of a CDL in Mexico are lower than the standards the FHWA has imposed on American states.
 
 
 16
 The union, significantly, makes no claim that the CDL standards embraced by the Memorandum of Understanding violate the minimum criteria imposed by the Safety Act itself; its complaint is that the Memorandum's criteria are laxer than the regulatory standards that the FHWA has promulgated for American states. As the Implementing Rule was promulgated under the authority of the Safety Act, it (and the standards of the Memorandum of Understanding) appear to be part of the "minimum Federal standards" referred to in Sec. 2704(b). Those standards in effect call for drivers of commercial motor vehicles either to have taken and passed the CDL tests of an American state that meets the requirements spelled out in 49 CFR part 383, or to have taken and passed the Mexican CDL tests (which the Secretary has determined are "similar to" the American tests even if not identical). There being no statutory requirement that the minimum federal standards be identical without regard to nationality, there is at most an implicit requirement that standards for foreign nationals be in substance "similar to" those for U.S. nationals, the standard the Secretary has applied. We must therefore reject this challenge unless his finding of similarity is arbitrary and capricious.
 
 
 17
 In fact, most of the alleged divergences between Mexican and American CDL standards prove to be illusory. For instance, the union protests that the Memorandum of Understanding allows issuance of CDLs to 18-year-olds, does not require applicants to demonstrate any knowledge of English, and fails to specify any limits on Mexican drivers' hours of service. In the United States, by contrast, federal regulations stipulate that people who drive commercial motor vehicles in interstate or foreign commerce must be at least 21 years old, 49 CFR Sec. 391.11(b)(1); be able to read and speak English, id. Sec. 391.11(b)(2); and (with certain exceptions) adhere to limits on hours of service, id. Sec. 395. But these are operating standards, not licensing standards. The federal age requirement, for example, is one of a long list of necessary "qualifications" that apply in addition to the requirement that drivers possess a valid CDL. See id. Sec. 391.11(b)(7); id. Sec. 391.11(a) ("A person shall not drive a motor vehicle unless he is qualified...."); see also id. Sec. 395.1(a) (stating that hours-of-service rules "apply to all motor carriers and drivers"); cf. id. Sec. 383.23(a) (indicating that the federal licensing standards are confined to 49 CFR part 383, not the sections petitioner cites). Mexican truck drivers who want to drive on American highways are subject to these operating standards, just as they are subject to American speed limits.
 
 
 18
 The American system of license "endorsements" provides a more fertile ground for the petitioner. Pursuant to the minimum standards that the FHWA imposes on the states, an American truck driver who wants to operate double or triple trailers, passenger vehicles, tank vehicles, hazardous-material carriers, or vehicles equipped with air brakes must get a special endorsement on his CDL by passing a test specific to the vehicle class in question. 49 CFR Secs. 383.93, 383.95. In addition, the regulations establish three "groups" of commercial motor vehicles and do not permit drivers to operate trucks in the more demanding groups unless they have demonstrated their ability to do so. Id. Sec. 383.91. The Mexican scheme does not use such endorsements.
 
 
 19
 The government responds that the Mexican system is comparable to the American one. Instead of using endorsements, Mexico issues CDLs in three different categories.[2] Category C, for instance, covers 2- and 3-axle trucks, while Category B covers other types of freight trucks (including combination vehicles). Respondents' Appendix ("Resp.App.") at 168. To get licensed to drive trucks in a particular category, the government asserts, Mexican applicants "must pass the test for all such vehicles" regardless of the particular type of freight truck that they will be driving. Brief for Respondents at 35. After some study, the United States concluded that "the Mexican license class scheme incorporates what the U.S. has as endorsements into its basic classes". Resp.App. at 199. The government does not present much evidence or analysis to support this conclusion, but the Teamsters present none to undermine it.
 
 
 20
 The remainder of the petitioner's complaints focus not on licensing standards, but on other aspects of the Safety Act. For instance, the union denounces the alleged inadequacy of the system of information exchange between the United States and Mexico. The Memorandum of Understanding declares that "[o]n a regular basis, but not less than annually," Mexico and America will exchange information about suspensions or revocations of CDLs, and about convictions for traffic violations; the countries also will exchange "general information" regarding CDLs. Though the union implies that this exchange somehow is not "structured" in a way that satisfies the Safety Act, it fails to point to any specific statutory requirement that it thinks has been violated. Indeed, beyond referring to the "clearinghouse function contemplated in Sections 2706 and 2707 of the Safety Act" (which indeed do require establishment of some duties relating to creation and exchange of information), the union's cursory discussion points to no specific provision that might be violated by implementation of the Memorandum of Understanding.
 
 
 21
 Likewise, the union protests that the Memorandum of Understanding is silent about drug and alcohol testing. Again the union confuses licensing with operating requirements. With certain exceptions, applicants for employment with an American motor carrier must be tested for controlled substances. 49 CFR Sec. 391.103. After being hired, they face some periodic and random testing. Id. Secs. 391.105, 391.111. These requirements apply regardless of the applicant's nationality, and thus cover Mexican nationals who work for American trucking companies. While they will not apply to "any foreign-based employee of a foreign-domiciled carrier" until January 2, 1995, id. Sec. 391.83(c), the union identifies no statutory requirement that this discrepancy violates; indeed, the Safety Act seems to contemplate that the Secretary's drug- and alcohol-testing regulations may apply special rules to foreign drivers. See 49 U.S.C. app. Sec. 2717(e)(3) (Supp.IV 1992). Further, although U.S. drivers holding a CDL are ipso facto deemed to have consented to testing for alcohol use, 49 CFR Sec. 383.72, while the Memorandum of Understanding makes no mention of such testing, a similar consent is inferred simply from "driving a commercial motor vehicle", id., so that we discern no functional difference.
 
 B. Notice and Comment
 
 22
 The union also protests that the FHWA issued the Implementing Rule without the notice and opportunity for comment required by 5 U.S.C. Sec. 553(b) and (c), and without the delayed effectiveness required by 5 U.S.C. Sec. 553(d). But Sec. 553 does not apply "to the extent that there is involved ... a ... foreign affairs function of the United States". 5 U.S.C. Sec. 553(a)(1). The rule at issue here, at least in the aspect challenged by the union, did no more than implement an agreement between the United States and Mexico. Assuming that Mexico was living up to its side of the bargain (and the union makes no claim that it was not), then the United States would have been reneging on international obligations if the FHWA had not issued the rule. In WBEN, Inc. v. United States, 396 F.2d 601, 616 (2d Cir.1968) (Friendly, J.), the court applied the "foreign affairs" exception to an FCC rule implementing an agreement between the United States and Canada that imposed power limits on presunrise broadcasts. Here as there the rule does no more than carry out obligations to a foreign nation undertaken for purposes of resolving a problem requiring coordination (here, work of citizens of each nation within the other; there, interference between broadcast signals). We believe it therefore involves a "foreign affairs function" within the meaning of Sec. 553(a). See also Mast Industries v. Regan, 596 F.Supp. 1567, 1580-83 (C.I.T.1984).
 
 
 23
 The union appears to argue that even if notice and comment were unnecessary under 5 U.S.C. Sec. 553, they were required under 49 U.S.C. app. Sec. 2715(b). According to that section, "All regulations under [the Safety Act] shall be issued in accordance with section 553 of Title 5...." This appears to do no more than make Sec. 553 applicable, its exceptions no less than its affirmative requirements. Thus it adds nothing to petitioner's APA claim.
 
 
 24
 Finally, the FHWA's own regulations call for it to provide notice and an opportunity for public participation before issuing rules under either 49 U.S.C. Sec. 3102 or the Safety Act, and there is no "foreign affairs" exception to this regulatory requirement. See 49 CFR Sec. 389.11. But the regulatory requirement does not apply when "the Administrator, for good cause, finds that notice is ... unnecessary ... and incorporates that finding and a brief statement of the reasons for it in the rule". Id. The Administrator included just such a statement in the rule at issue here, invoking the regulatory exception "because it is not anticipated that [notice and comment] would result in the receipt of useful information". 57 Fed.Reg. at 31,455. After all, assuming that Mexico was issuing CDLs in accordance with the annex to the Memorandum of Understanding, the agreement called for the United States to recognize Mexican CDLs even if comments revealed widespread objections. We do not address whether this reasoning would suffice to invoke the parallel statutory exception for cases in which notice and comment is "unnecessary", see 5 U.S.C. Sec. 553(b).[3] But in light of the deference we owe to agencies' interpretations of their own regulations, see, e.g., Udall v. Tallmann, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801-802, 13 L.Ed.2d 616 (1965), we hold that the FHWA did not violate its regulatorynotice requirements. Cf. Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974).
 
 C. Trade Acts
 
 25
 Viewing the Memorandum of Understanding as a "trade agreement", the petitioner also protests that no bill implementing it was enacted into law, despite what the petitioner considers the requirements of the Trade Act of 1974, see 19 U.S.C. Secs. 2112(d) and 2191, and the Omnibus Trade and Competitiveness Act of 1988, see id. Sec. 2903(a)(1)(C).[4] The petitioner does not explain why an accord between America and Mexico to recognize each other's CDLs is properly classified as a "trade agreement". Without citing the relevant statutory provisions, the petitioner does hint at the fact that 19 U.S.C. Sec. 2906(5)(A) defines "international trade" to cover trade in services (including, presumably, transportation services, cf. id. Sec. 2114b(5)). But beyond this, the petitioner offers no argument at all as to why the CDL accord qualifies as a "trade agreement". Indeed, apparently to buttress its position that the "foreign affairs" exception to 5 U.S.C. Sec. 553 does not apply to the FHWA's implementation of the Memorandum of Understanding, the petitioner has backed away from the claim that the Implementing Rule relates to "trade in transportation services". See Petitioner's Reply Brief at 4. If agreements to honor foreign CDLs are trade agreements, then so would be a wide range of agreements on comparable issues, such as ones addressed under the immigration laws. As petitioner offers no serious support for its contention, we proceed no further. See Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983) (reasoning that in adversary system courts should decline to entertain "asserted but unanalyzed" claims the resolution of which might have far-reaching consequences); cf. Wheeler v. Sims, 951 F.2d 796, 804 (7th Cir.1992); United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990) ("It is not enough merely to mention a possible argument in the most skeletal way," leaving the court to do all the rest).
 
 
 26
 Finding the petitioner's remaining arguments equally unsubstantiated, we deny the petition.
 
 
 27
 So ordered.
 
 
 
 [1]
 We express no view on this question. In particular, our citation of Owner-Operator Independent Drivers should not be interpreted to suggest that the courts of appeals lack original jurisdiction to review regulations that the FHWA issues exclusively under the Safety Act. After all, one could argue that the FHWA is performing a transferred "function" whenever it regulates commercial motor vehicle safety, even if the only authority actually invoked derives from a post-transfer statute. We do not rule one way or the other on this issue
 
 
 [2]
 After the Memorandum of Understanding was signed, Mexico added a fourth category dealing with carriers of hazardous materials
 
 
 [3]
 The agency itself seemed to think that its "useful information" reasoning applied only to the regulatory exception, not to the statutory one. See 57 Fed.Reg. at 31,455
 
 
 [4]
 19 U.S.C. Sec. 2112 seems of no help to petitioner, as its requirements apply only to trade agreements entered into before January 3, 1988. See id. Sec. 2112(b)(1). 19 U.S.C. Sec. 2191, however, established procedures that may be triggered by the Omnibus Trade and Competitiveness Act of 1988. See id. Sec. 2191(b)(1)