*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0248P (6th Cir.)
File Name: 02a0248p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOHN M. COURTNEY, LARRY
E. TROUTMAN, and MALCOLM
A. WEBSTER,
     *Plaintiffs-Appellants,*

No. 00-4554

*v.*

DAVID R. SMITH, Major
General, Vice Commander of
the HQAFRC/CV,
     *Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 00-01247—David D. Dowd, Jr., District Judge.

Argued: May 2, 2002

Decided and Filed: July 23, 2002

Before: MERRITT, SUHRHEINRICH, and GILMAN,
Circuit Judges.

------------------

**COUNSEL**

**ARGUED:** Patrick J. Donlin, Warren, Ohio, for Appellants. Thomas M. Bondy, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE SECTION, Washington, D.C., for Appellee. **ON BRIEF:** Patrick J. Donlin, Warren, Ohio, for Appellants. Thomas M. Bondy, Anthony J. Steinmeyer, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE SECTION, Washington, D.C., for Appellee.

GILMAN, J., delivered the opinion of the court, in which SUHRHEINRICH, J., joined. MERRITT, J. (pp. 20-21), delivered a separate dissenting opinion.

------------------

**OPINION**

------------------

RONALD LEE GILMAN, Circuit Judge. John M. Courtney, Larry E. Troutman, and Malcolm A. Webster brought suit against Major General David R. Smith, the Vice-Commander of the U.S. Air Force Reserve Command (AFRC), alleging that the federal government violated its internal policies and various laws by outsourcing certain work performed at the Youngstown-Warren Air Force Reserve Base to Griffin Services, Inc., a private contractor. According to the plaintiffs, all of whom worked at the Base prior to the government's decision, the government failed to perform the required cost comparison before granting the contract to Griffin, or made its decision based upon a faulty analysis.

The district court dismissed the complaint for lack of standing, concluding that the plaintiffs failed to demonstrate an injury in fact, one of the three prerequisites for constitutional standing. In addition, the district court determined that the plaintiffs lacked prudential standing because they were not within the "zone of interests" protected

by the statutes under which they brought suit. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

The Base in question is located in Vienna, Ohio. A cost-comparison analysis of the work performed at the Base began in 1998. This action was initiated by the AFRC pursuant to the procedures set forth in Office of Management and Budget Circular No. A-76 (the Circular). The Circular requires that all commercial activities that are not inherently governmental in nature must be performed by private contractors unless one of several exceptions applies. At issue in the present case is the exception that directs the government to perform work in-house if a cost comparison "demonstrates that the Government is operating or can operate the activity on an ongoing basis at an estimated lower cost than a qualified commercial source." Executive Office of the President, OMB Circular A-76, para. 8(d) (Revised 1999). To comply with the periodic review mandated by the Circular, the AFRC's analysis sought to determine whether a private contractor could perform Base Operating Support Services (BOS) more economically than the federal employees who were doing the work on the Base.

The AFRC announced its decision to grant the BOS contract to Griffin in January of 2000. Within a month of the government's announcement, the union representing the Base's employees filed an appeal of the outsourcing decision with the AFRC. This internal appeal was made possible because of the Circular's requirement that agencies establish an administrative appeals procedure to resolve complaints by "federal employees . . . that have submitted formal bids or offers who would be affected by a tentative decision to convert to or from in-house, contract, or [Inter-Service Support Agreements] as a result of a cost comparison." OMB Circular A-76, Supp. Part I, Ch. 3, para. K(2)(b). The AFRC denied the union's appeal in March of 2000.

## B.   Procedural background

This lawsuit was filed in the United States District Court for the Northern District of Ohio in May of 2000.  According to the plaintiffs' amended complaint, the government's decision to award the BOS contract to Griffin rather than to the in-house government employees violated (1) Circular A-76 and its accompanying Supplement, (2) The Budget and Accounting Act of 1921, ch. 18, 42 Stat. 20 (1921) (codified as amended in scattered sections of 31 U.S.C.), (3) the Office of Federal Procurement Policy Act Amendments of 1979, 41 U.S.C. §§ 403-36, (4) the Federal Activities Inventory Reform Act of 1998, 31 U.S.C. § 501 Note (Supp. 2002), (5) various federal procurement statutes, 10 U.S.C. §§ 2304, 2461-63, 2467-69, and (6) the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.  All three plaintiffs were then working for the Vehicle Maintenance Group at the Base, one of the activities covered by the BOS contract.

The plaintiffs filed a motion for class certification in August of 2000, seeking to represent 93 similarly situated civilian employees at the Base.  That same month, the government filed a motion to dismiss for lack of standing. The district court denied class certification in September of 2000 and dismissed the case for lack of standing approximately two months later.  With respect to the defendants' motion, the court concluded that the plaintiffs were unable to establish the constitutional requirements for standing because their alleged injuries—the loss of their jobs—had not occurred and were only speculative, and because no guarantee existed that their jobs would have been preserved even if the BOS contract had remained in-house. The district court also determined that because the plaintiffs were not within the "zone of interests" intended to be protected by the statutes under which they had brought suit, they did not satisfy the prudential requirements of standing. This timely appeal followed.

consequences.  But to say they are not "adversely affected" by agency action abolishing their jobs defies common sense as well as the position and interpretation of the White House — embodied in Circular 76-A — about who is "directly affected" by such decisions.  For this reason, as well as the reasons generally stated in Judge Mikva's dissent in *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1054 (D.C. Cir. 1989), I would grant standing.

—————————

### DISSENT

—————————

MERRITT, Circuit Judge, dissenting. The Administrative Procedure Act provides that a "person suffering legal wrong because of agency action, or *adversely affected or aggrieved by agency action within the meaning of a relevant statute*, is entitled to judicial review thereof." 5 U.S.C. § 702 (emphasis added). The three plaintiffs, civilian employees of the Defense Department at the Youngstown-Warren Air Force Base, brought this action as aggrieved parties under the Administrative Procedure Act to review a contracting-out decision. The employees are in the "vehicle maintenance group" at the Base and allege that an award of a Defense Department contract to Griffin Services, Inc. will cause them to "lose their federal jobs unless" the award is enjoined. The District Court held that they lack standing because their claim does not satisfy either the "injury-in-fact" test for Article III standing or the APA "zone of interest" test for "Prudential APA standing" as outlined in *NCUA v. First National Bank & Trust*, 522 U.S. 479, 488 (1998). Such contracting-out or privatization decisions are governed by Circular A-76, adopted in 1983 by the Office of Management and Budget for its subsidiary Office of Federal Procurement, pursuant to the Office of Federal Procurement Act Amendments of 1979, 41 U.S.C. § 401. Section 6g of Circular A-76 provides that when contracting-out decisions are made: "*Directly affected parties* are Federal employees and their representative organizations and bidders or offerors on the instant solicitation" (emphasis in original). The precise question here, a question not expressly addressed in the District Court, is whether this provision of Circular A-76 defining Federal employees as "directly affected parties" under the Procurement Act is sufficient to make federal employees who are about to lose their jobs "adversely affected or aggrieved" parties under the Procurement Act and APA. The contracting-out decision in this case may turn out to be fine on the merits, and the plaintiffs will simply have to suffer the

## II.  ANALYSIS

### A.   Standard of review

We review de novo a district court's decision to dismiss a case for lack of standing. *Am. Fed'n of Gov't Employees v. Clinton*, 180 F.3d 727, 729 (6th Cir. 1999). "For purposes of ruling on a motion to dismiss for lack of standing, a complaint must be viewed in the light most favorable to the plaintiff; all material allegations of the complaint must be accepted as true." *Id*. But the plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that the party invoking federal jurisdiction has the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing").

### B.   Constitutional standing

Article III of the United States Constitution limits the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To satisfy this "case-or-controversy" requirement, "a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue—the injury must be fairly traceable to the defendant's action; and (3) [a] likelihood that the injury would be redressed by a favorable decision of the Court." *Blachy v. Butcher*, 221 F.3d 896, 909 (6th Cir. 2000) (internal quotation marks omitted); *Lujan*, 504 U.S. at 560 (noting that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement").

The district court concluded that the plaintiffs failed to satisfy the injury-in-fact requirement because their alleged injuries—the loss of their jobs—had not actually occurred and were therefore only hypothetical. In reaching its decision, the court noted that federal regulations required Griffin to offer the plaintiffs, as federal employees, "the right of first refusal

for employment openings under the contract in positions for which they are qualified . . . ." 48 C.F.R. § 52.207-3(a). The district court also expressed its view that "even if the contract had been awarded to the in-house bidders, there is no guarantee that plaintiffs would not have been subject to a RIF [reduction in force] anyway." As a result, the court concluded that the plaintiffs were unable to establish the second and third requirements of Article III standing—causation and redressability.

In response, the plaintiffs argue that the district court failed to give effect to a supporting affidavit establishing that Courtney lost his job at the Base and had to accept a position at Tobyhanna Army Repair Depot in Pennsylvania, 350 miles east of the Base, in order to remain a federal employee. The affidavit specifies that Courtney's transfer led to his being separated from his family, all of whom remained in Ohio. Courtney was therefore forced to commute 700 miles round trip every weekend in order to see his family. Although these facts did not appear in the plaintiffs' complaint, the timely filed affidavit supports the proposition that at least one of the plaintiffs has standing to bring this lawsuit. *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (noting that "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing").

The affidavit does not discuss whether Courtney's new position had a lower salary or reduced benefits, so we are unable to determine whether his move resulted in any economic harm. Courtney's geographic separation from his family, and the associated inconvenience and expense of having to travel 700 miles each weekend to be with them, might be a sufficient injury to satisfy the first requirement of Article III standing. *See Associated Builders & Contractors v. Perry*, 16 F.3d 688, 691 (6th Cir. 1994) (explaining that "a sufficient 'injury in fact' can be alleged from a noneconomic or aesthetic harm"). But the affidavit does not address whether Troutman or Webster experienced any comparable

(internal quotation marks omitted); *Wooden v. Bd of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1287 (11th Cir. 2001) (holding that "as a prerequisite to certification, it must be established that the proposed class representatives have standing to pursue the claims as to which classwide relief is sought"). We therefore conclude that the district court did not err in denying the plaintiffs' motion for class certification.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

F.2d at 1050 (quoting S. Rep. No. 331, 99th Cong., 2d Sess. 278 (1986), 1986 U.S. Code Cong. & Admin. News 6413, 6472); *Cohen*, 171 F.3d at 470 (noting that the legislative history of § 2462 indicates that the obligation to perform "realistic and fair" cost comparisons "was meant to 'enable private industry to compete with the government sector whenever possible . . .'") (quoting S. Rep. No. 331, 99th Cong., 2d Sess. 278 (1986), 1986 U.S. Code Cong. & Admin. News 6413).

Section 2461 requires the DOD to consider "the potential economic effect of performance of the function by the private sector on . . . [e]mployees of the [DOD] who would be affected by such a change in performance." 10 U.S.C. § 2461(b)(3)(B)(i). But we have found no legislative history, nor have the plaintiffs cited any, indicating that this provision was intended to preserve federal employment. On the contrary, § 2461, when read in conjunction with the other procurement statutes and the Circular, recognizes that the DOD will likely transfer work to private contractors in order to increase government efficiency. *See Cohen,* 171 F.3d at 471 (concluding that "the interests of federal employment, and the goal of private procurement are inconsistent").

For these reasons, we conclude that the plaintiffs do not fall within the "zone of interest" of any of the procurement statutes cited in their complaint. These statutes thus cannot serve as the basis for the plaintiffs to bring their APA challenge.

**D.   Class action**

The plaintiffs also appeal the district court's denial of their motion for class certification. Based upon our conclusion that the plaintiffs lack standing to bring their lawsuit, however, they cannot advance the claims of other unnamed individuals. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (explaining that "even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent")

inconveniences or separations from their families. As a result, even if Courtney's compelled move to Pennsylvania meets the injury-in-fact requirement, neither Troutman nor Webster have provided any evidence to support a conclusion that they have suffered an injury in fact.

Rather than deciding whether Courtney has established Article III standing when it appears unlikely that the other two plaintiffs have done so, we will proceed to an examination of the prudential standing requirements. Our conclusion below that the plaintiffs have failed to satisfy the requirements of prudential standing eliminates the need to rule definitively on the question of constitutional standing. *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) ("Because we find that the Federation lacks prudential standing, we need not consider the issue of constitutional standing or the political question doctrine.").

**C.   Prudential standing**

Section 10(a) of the Administrative Procedure Act (APA) permits injured parties to obtain judicial review of agency actions that allegedly violate federal statutes. 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."). A plaintiff seeking judicial review of agency action under the APA, however, must not only meet the constitutional requirements of standing, but must also demonstrate prudential standing. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (*NCUA*) ("We have interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact."). Prudential standing exists if the interest that the plaintiff seeks to protect is "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* (ellipsis in original) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

The Supreme Court has acknowledged that the "zone of interest" test "has not proved self-explanatory." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987). Nevertheless, the Court has set forth several general principles to govern the prudential-standing inquiry:

> The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id*. at 399-400 (footnote omitted). Rather than examining whether Congress specifically intended to benefit the plaintiff, the "zone of interest" inquiry consists of "first discern[ing] the interests arguably . . . to be protected by the statutory provision at issue" and "then inquir[ing] whether the plaintiff's interests affected by the agency action in question are among them." *NCUA*, 522 U.S. at 492 (ellipsis in original) (internal quotation marks omitted).

The plaintiffs in the present case have a particular interest in retaining their government jobs at the Base. They also assert a more general interest in ensuring that the government conforms to the applicable laws in making outsourcing decisions. But this generalized grievance, which presumably would be shared by all citizens, is insufficient to satisfy the prudential standing requirements. *Coal Operators & Assocs., Inc., v. Babbitt*, 291 F.3d 912, 916 (6th Cir. 2002) (explaining that for the purpose of prudential standing, "a plaintiff's claim must be more than a 'generalized grievance' that is pervasively shared by a large class of citizens") (citing *Valley*

commercial or industrial functions that were being performed by DOD civilian employees as of October 1, 1980 to the private sector, 10 U.S.C. § 2461, (3) require the DOD to obtain supplies and services from private sector sources if "realistic and fair" cost comparisons reveal that reliance on private contractors would be more economical than the use of federal civilian employees, 10 U.S.C. § 2462, (4) oblige the DOD to collect and retain "cost information data" after changing the source of DOD services or functions from civilian employees to private contractors or from private contractors to civilian employees, 10 U.S.C. § 2463, (5) mandate that the DOD consider "retirement system costs . . . of both the [DOD] and the contractor" in conducting any cost comparisons required by the Circular, 10 U.S.C. § 2467, and (6) set forth requirements for contracts to perform "a depot-level maintenance and repair workload." 10 U.S.C. § 2469.

We conclude that none of these statutes support a finding that Congress intended to protect the jobs of federal employees. *Cohen,* 171 F.3d at 470-73 (holding that the plaintiffs were not within the zone of interests protected by either § 2304 or § 2462); *Cheney*, 883 F.2d at 1051 ("Insofar as appellants assert an interest different from the citizenry-at-large, that interest—the protection of government employees whose job opportunities would be impaired because of contracting out—is close to the very bureaucratic interest, in expansion of government, that Congress sought to restrain in all of these statutes.").

The requirements of performing realistic and fair cost comparisons and of considering all relevant factors, as previously noted, suggests that Congress intended for the government to operate efficiently and procure its goods and services in the most economical way possible. Moreover, the legislative history of 10 U.S.C. § 2462 indicates that "the provision for a 'realistic and fair' cost comparison was designed to protect the integrity of the contracting out process by resolving 'handicaps' against government contractors—the apparent intended beneficiaries of [the statute]." *Cheney*, 883

review process therefore benefits federal employees who contend that their work is inherently governmental and consequently should not be on the lists.

But nothing in the FAIRA provides for review of the cost comparisons that an agency performs. Moreover, the requirement that agencies prepare lists of all activities that are not inherently governmental accords with the federal government's policy, as expressed in the Circular, to procure its goods and services from private contractors whenever possible. This policy is also apparent in the FAIRA's legislative history. *Id*. at 597 (acknowledging that the FAIRA's principal sponsor, Senator Craig Thomas, stated "that Congress intended [the FAIRA] to 'codif[y] a process to assure government reliance on the private sector to the maximum extent feasible'") (citing 144 Cong. Rec. S9104-02, S9105 (daily ed. July 28, 1998) (statement of Sen. Thomas)). The FAIRA therefore provides no indication that Congress intended to benefit or protect federal employees who are performing work that is concededly not inherently governmental.

For these reasons, we conclude that the plaintiffs' interest in maintaining their federal employment is at best marginally related to, and more likely inconsistent with, the purpose of the FAIRA. *See Am. Fed'n of Gov't Employees v. Cohen*, 171 F.3d 460, 471 (7th Cir. 1999) (*Cohen*) (concluding that "the interests of federal employment and the goal of private procurement are inconsistent"). This statute therefore cannot serve as "a relevant statute" for the purpose of the plaintiffs' APA challenge.

### 5.   *Various procurement statutes*

Finally, the plaintiffs seek to rely upon several procurement statutes to establish that they have prudential standing. These statutes, among other things, (1) require the use of competitive procedures "in conducting a procurement for property or services," 10 U.S.C. § 2304(a), (2) mandate that the Department of Defense (DOD) comply with certain reporting and analysis requirements before transferring

*Forge Christian College v. Americans United for the Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982)); *Nat'l Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1047 (D.C. Cir. 1989) (*Cheney*) ("Appellants may have many 'interests,' but for zone of interest purposes we must look to their particular interests, not to the interests amounting to generalized grievances of all citizens.").

Similarly, the Supreme Court has admonished against allowing plaintiffs to meet the constitutional or prudential requirements of standing by asserting that no other plaintiffs are available to challenge the government actions. *Valley Forge Christian College*, 454 U.S. at 489 ("But '[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.'" (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) (alternation in original)). We must therefore determine whether the plaintiffs' desire to continue working at the Base falls within the "zone of interest" of any of the statutes cited in their complaint.

### 1.   *OMB Circular A-76 and Supplement*

The plaintiffs first rely upon the Circular and its Supplement to demonstrate that their interests are among those that "a relevant statute" seeks to protect. 5 U.S.C. § 702. But neither the Circular nor the Supplement are statutes. *Cheney*, 883 F.2d at 1043 ("The Circular is not a statute, and, although promulgated pursuant to congressional authority, the Circular itself cannot grant standing.") (citation omitted). Instead, they represent and implement the policy of the Executive Branch, which issued the Circular and Supplement pursuant to the authority of the Budget and Accounting Act of 1921, the Office of Federal Procurement Policy Act Amendments of 1979, and the Federal Activities Inventory Reform Act of 1998. Executive Office of the President, OMB Circular A-76, para. 3 (Revised 1999). We therefore conclude that the plaintiffs cannot rely upon the Circular and Supplement to obtain judicial review of whether the AFRC properly awarded the BOS contract to Griffin.

*Cheney*, 883 F.2d at 1043 (holding that the plaintiffs, who asserted a claim under the APA to challenge the Army's decision to outsource the work that the plaintiffs had previously performed, could not rely upon the Circular as "a relevant statute" for the purpose of their lawsuit).

Nevertheless, the Circular is relevant insofar as it provides an indication of the congressional purpose behind any of the relevant statutes that plaintiffs contend the AFRC violated. *Clarke*, 479 U.S. at 401 (explaining that "we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes" in the relevant statutes); *Nat'l Air Traffic Controllers Ass'n v. Pena*, No. 95-3016, 1996 WL 102421, at * 3 (6th Cir. March 7, 1996) (unpublished table decision) ("To the extent that the policies of OMB Circular A-76 are reflected in the [relevant statute] and can inform our understanding of [that statute], its policies may be considered in determining standing.").

But the Circular provides minimal support at best for the plaintiffs' argument that their desire to maintain government employment falls within the zone of interests protected by the relevant statutes. As noted above, the Circular expresses an unmistakable preference for the federal government to rely upon private contractors to perform commercial activities that the government requires. Executive Office of the President, OMB Circular A-76, para. 4(a) (Revised 1999) ("[I]t has been and continues to be the general policy of the Government to rely on commercial sources to supply the products and services the Government needs."). The Circular also specifies that it does not

> [e]stablish and shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction on the basis that such action or inaction was not in accordance with this Circular, except as specifically set forth in Part I, Chapter 3, paragraph K of the Supplement, 'Appeals of Cost Comparison Decisions,' and as set forth in

*4.   The Federal Activities Inventory Reform Act of 1998*

Shifting to the Circular's final authorizing statute, the plaintiffs next rely upon the Federal Activities Inventory Reform Act of 1998, 31 U.S.C. § 501 Note (Supp. 2002) (FAIRA), to support their prudential standing argument. This statute requires the head of each executive agency to submit "a list of activities performed by Federal Government sources for the executive agency that, in the judgment of the head of the executive agency, are not inherently governmental functions" to the Director of the OMB on a yearly basis. 31 U.S.C. § 501 Note § 2(a). These lists, which agency heads must provide to Congress and which the Director of the OMB must publish in the Federal Register, identify the activities that the agency heads can consider contracting out to the private sector. *Id*. § 2(c),(d). The FAIRA requires the agency head to utilize "realistic and fair" costs in comparing the expense of procuring services from a private contractor with the costs of federal employees performing the work. *Id*. § 2(e).

Although the FAIRA allows challenges by interested parties, including "[a]n officer or employee of an organization within an executive agency that is an actual or prospective offeror to perform the activity," *id*. § 3(b)(3), these appeals to executive agencies are limited to "a challenge of an omission of a particular activity from, or an inclusion of a particular activity on, a list . . . ." *Id*. § 3(a); *Am. Fed'n of Gov't Employees v. United States*, 46 Fed. Cl. 586, 598 (Fed. Cl. 2000) (noting that the FAIRA "specifically distinguishes between the agency's decision to place a particular activity on the list to be contracted out and the agency's decision to contract out to a particular source," that § 3(a) of the statute "is cognizant of this distinction and expressly limits authorized challenges" to the omission or inclusion of an activity on a list, and that the FAIRA's definition of interested parties in § 3(b) "expressly limits challenges to those 'with respect to an activity referred to in subsection [2](a)'") (internal citation omitted) (alteration in original), *aff'd on alternative grounds*, 258 F.3d 1294 (Fed. Cir. 2001). This

policy that the OFPP was directed to implement reflects a desire to outsource government work whenever doing so would result in increased cost efficiency. *Cheney*, 883 F.2d at 1049 ("After a thorough review of the OFPPAA and its legislative history, we have found nothing to suggest a congressional purpose more than marginally related to the interests of federal employees *vis-a-vis* procurement policy. Throughout the legislative history of OFPPAA and its amendments, Congress emphasized economy and efficiency in government operations."). As the D.C. Circuit noted, the Senate Report accompanying the OFPPAA "does not merely favor the private sector; it endorses 'reliance' on the private sector." *Id.* (quoting S. Rep. No. 144, 96th Cong., 1st Sess. 4 (1979), 1979 U.S. Code Cong. & Admin. News 1492).

Accurate comparisons between the cost of in-house performance and private contracts are essential to achieving the OFPP's goals, but this desired result does not support a finding that Congress had a concern with preserving federal employment when it enacted the OFPPAA. Instead, it demonstrates Congress's interest in ensuring that government funds are spent efficiently. *See id.* (concluding that the Senate Report's "call for 'rigorous comparison of contract cost versus in-house cost,' read in the context of the whole policy, illustrates that Congress wanted in-house costs estimates to be strictly reviewed, so as not to frustrate the . . . emphasis on the private sector") (quoting S. Rep. No. 144, 96th Cong., 1st Sess. 4 (1979), 1979 U.S. Code Cong. & Admin. News 1492). The desire to achieve this goal is shared by all taxpayers, and is not a particular interest of the plaintiffs.

For these reasons, we conclude that the plaintiffs' cognizable interests are not within the "zone of interests" that the OFPPAA protects or regulates. *Cheney*, 883 F.2d at 1050 (concluding that the plaintiffs' interests "are inconsistent with the purposes of the OFPPAA and not within the zone of interest of that Act"). The OFPPAA therefore cannot serve as "a relevant statute" pursuant to which the plaintiffs can bring their APA challenge.

Appendix 2, Paragraph G, consistent with Section 3 of the Federal Activities Inventory Reform Act of 1998.

*Id.* at para. 7(c)(8); *see id.* Supp. Part I, Ch. 3, para. K(7) ("The procedure does not authorize an appeal outside the agency or judicial review . . . ."). This limitation suggests that the internal administrative appeals process set forth in the Supplement is intended to be the sole basis for challenging agency action that allegedly violates the Circular.

The dissent focuses on the Circular's definition of "directly affected parties" to support its conclusion that the plaintiffs are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. We believe that reliance upon this definition is misplaced, however, for two reasons. First, as noted above, the Circular is not a statute. Second, a party cannot be "adversely affected . . . within the meaning of a relevant statute" unless the party is within the zone of interest sought to be protected by that statute. The Circular's identification of "directly affected parties," in our opinion, relates to nothing more than the internal administrative appeals process detailed in the Supplement. We therefore respectfully disagree with the dissent's conclusion that the plaintiffs' status as "directly affected parties" under the Circular's terms places them within the zone of interest sought to be protected by a relevant statute.

### 2. *The Budget and Accounting Act of 1921*

The first statute upon which the plaintiffs rely to meet the prudential standing requirements is the Budget and Accounting Act of 1921, ch. 18, 42 Stat. 20 (1921) (codified as amended in scattered sections of 31 U.S.C.) (the 1921 Act). This legislation, which has been amended thirteen times since its original enactment, was designed "to coordinate budgeting procedures and to increase efficiency in government operations after vast governmental growth during World War I." *Cheney*, 883 F.2d at 1044-45. The 1921 Act sought to achieve these goals by (1) creating the Bureau of the Budget (the predecessor to the OMB) within the Department

of the Treasury, and (2) establishing the General Accounting Office (GAO) to serve Congress's interests in auditing federal programs and expenditures. *Id*. at 1045-46 (discussing the key components of the 1921 Act); 31 U.S.C. §§ 501-02, 521-22 (recognizing the OMB as "an office in the Executive Office of the President," designating the key staff positions at the OMB, and granting the OMB's Director the authority to appoint employees and make necessary expenditures); 31 U.S.C. §§ 701-20 (setting forth the GAO's duties and designating its key personnel). These two offices were intended to serve as "checks and balances" over the budgeting process. *Cheney*, 883 F.2d at 1045-46 (noting that "Congress considered these two separate offices, the Bureau and the GAO, one within each political branch, as a functional and valid constitutional 'check and balance' over the expenditure of funds") (citing 59 Cong. Rec. 7949 (1920) (statement of Rep. James W. Good)).

We agree with the Court of Appeals for the District of Columbia's conclusion that the 1921 Act's legislative history provides no support for the proposition that Congress intended to safeguard the employment of federal employees, or even to provide those workers with a procedure by which they could challenge budgetary decisions which adversely affected them. *Cheney*, 883 F.2d at 1046 ("Nothing in the legislative history of the 1921 Act suggests that Congress contemplated the protection of employment of federal employees."). Instead, the legislative history indicates that Congress was aware that a number of federal employees would lose their jobs as a result of the changes implemented by the 1921 Act. *Id*. at 1046-47 (citing Representative Good's acknowledgment that federal employees would be discharged by the Bureau of the Budget, and noting that "although Congress was well aware that the reformation of the federal budgeting process would result in a loss of federal jobs, it afforded the discharged employees neither protection nor remedy").

We therefore conclude that the plaintiffs' interests in maintaining their employment at the Base are not within the

"zone of interests" protected or regulated by the 1921 Act. *Id*. at 1048 ("[T]he legislative history of the Budget and Accounting Act of 1921, as amended, leads us to conclude that Congress did not contemplate in-house federal employees and federal employee labor unions as plaintiffs."). The plaintiffs' particular interests are instead most accurately viewed as being "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *Cheney*, 883 F.2d at 1048 ("At most, federal employees' interests are marginally related to this centralized annual budgeting process balanced between the Executive and Legislative branches [in the 1921 Act]. It is more logical to conclude that federal employees' interests are inconsistent.") (internal quotation marks and citation omitted). As a result, the 1921 Act cannot serve as "a relevant statute" pursuant to which the plaintiffs can bring their APA challenge to the AFRC's outsourcing decision.

### 3. The Office of Federal Procurement Policy Act Amendments of 1979

The second statute cited by the plaintiffs in support of their prudential standing argument is the Office of Federal Procurement Policy Act Amendments of 1979, 41 U.S.C. §§ 403-36 (OFPPAA). This legislation extended the existence of the Office of Federal Procurement Policy (the OFPP), which Congress had established in 1974, and amended various aspects of the statute. The central purpose of the OFPP is "to provide overall direction of Government-wide procurement policies, regulations, procedures, and forms for executive agencies and to promote economy, efficiency, and effectiveness in the procurement of property and services by the executive branch of the Federal Government." 41 U.S.C. § 403(a).

Nothing in the OFPPAA or in its legislative history supports the conclusion that Congress intended to protect the employment of federal workers. Instead, the procurement