**DISMAS CHARITIES, INC. Plaintiff**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS Defendant**

**No. CIV.A. 303CV158H.**

United States District Court,
W.D. Kentucky
at Louisville.

Oct. 10, 2003.

Thomas C. Hill, Alex D. Tomaszczuk, Daniel S. Herzfeld, Shaw Pittman LLP, Washington, DC, Sheryl G. Snyder, Winston E. Miller, John R. Crockett III, Frost

Brown Todd LLC, Louisville, for Plaintiff's.

Benjamin S. Schecter, U.S. Attorney Office, Louisville, Vincent M. Garvey, Tamara Ulrich, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendant's.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff, Dismas Charities, Inc. ("Dismas Charities") challenges the Department of Justice's recent changes to its rules for designating the place of incarceration for federal offenders. Dismas Charities operates community correction centers under contracts with Defendant, Bureau of Prisons ("BOP"), and has lost revenues as a result of the rules change. It alleges that BOP has violated the notice and comment procedure requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 706(2)(D), and that BOP's regulation change was arbitrary, capricious, and an abuse of discretion. Dismas Charities has now moved for summary judgment on both counts. Defendant opposes that motion and moves to dismiss on the grounds that Dismas Charities lacks the required prudential standing to challenge the regulation.

Having carefully considered both parties' arguments on the prudential standing question, the Court concludes that Dismas Charities may not challenge BOP's new regulations.

## I.

Dismas Charities operates community correction centers in thirteen locations around the country, including Louisville, Kentucky. Generally, community correction facilities offer certain, generally low-risk, non-violent offenders an alternative facility in which to serve a portion or the entirety of their sentences. These centers offer a structured environment in which inmates are able to hold a job, save money, develop life skills, and enroll in treatment programs for substance abuse, wellness, and anger management in order to facilitate their re-entry into society and teach them how to lead a crime-free life.

BOP has broad statutory authority to designate an inmate's place of imprisonment. See 18 U.S.C. § 3621(b).[1] BOP usually sends offenders to community correction facilities either as a "front-end" designation to serve out the entire term, or as a "back-end" designation during the last portion of the offender's sentence as a way of helping the offender transition back to society. The use of community correction centers has proven a highly successful sentencing option.

For many years, the Office of Legal Counsel at the Department of Justice (the "OLC") consistently interpreted § 3621(b) to give BOP "open-ended authority" to determine where an inmate would serve his or her sentence. The OLC's interpretation permitted BOP to place inmates in privately owned facilities, including community correction centers. This interpretation authorized BOP to send an offender directly to a private facility usually upon recommendation by or agreement with the sentencing court. The OLC specifically rejected an interpretation of a companion statutory provision, 18 U.S.C. § 3624(c),[2] that limited the amount of time BOP could

---

1. Section 3621(b) reads as follows:

 The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable ....

2. Section 3624(c) reads as follows:

place an offender in a community correction facility to the final ten per cent of an offender's sentence, not to exceed six months.

On December 13, 2002, OLC issued an opinion revising its earlier interpretations of §§ 3621(b) and 3624(c). The new opinion stated that these statutory provisions did not permit BOP to designate offenders to community correction facilities at the outset of their sentences and restricted the amount of time BOP could place an offender in community correction centers to the last ten percent of the inmate's total sentence, not to exceed six months. On December 16, 2002, the Deputy Attorney General informed BOP that its prior practices with respect to community correction facilities were unlawful and that it must follow the OLC's most recent pronouncement. Thereafter, BOP announced that it would transfer inmates with greater than 150 days remaining in their sentences out of community correction centers and into prison facilities.

As a result of these policy changes, Dismas Charities has experienced a near total loss in front-end inmate commitments.

The number of back-end inmate commitments has dropped dramatically as well, due to BOP's compliance with the new directive. The revenue Dismas Charities earns from BOP reimbursements has declined significantly. The regulation change has also affected rehabilitation programs. Inmates serving sentences of less than five years will spend less than six months in community correction facilities (or possibly no time at all if the inmate's sentence is short enough that transfer to a community correction facility is not deemed worthwhile), the amount of time Plaintiff contends is necessary for an inmate to effect positive behavioral changes. Plaintiff also asserts that the rule change will have an adverse impact on the effectiveness of Plaintiff's rehabilitation programs and will endanger Plaintiff's "mission, [its] financial capability to operate community correction facilities and the prisoners' ability successfully to re-integrate into society."

Many federal inmates have challenged the change in BOP's regulation on a variety of grounds. Most appear to have succeeded.[3] Should the Court allow Dismas

---

The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.

3. The substantive issue, whether the new BOP policy is legally valid, appears to be fairly settled. Numerous federal district courts across the country have invalidated the policy because (1) it is procedurally improper under the Administrative Procedure Act because it was enacted without proper notice and comment; and (2) it is substantively invalid because it represents an unreasonable agency interpretation. *See Monahan v. Winn*, 276 F.Supp.2d 196, 197 (D.Mass.2003) ("Numerous courts across the country have found the new BOP policy to be legally invalid on a variety of grounds.") (collecting cases: *see, e.g., Iacaboni v. United States*, 251 F.Supp.2d 1015 (D.Mass.2003); *Pearson v. United States*, 265 F.Supp.2d 973 (E.D.Wis.2003); *Tipton v. Fed. Bureau of Prisons*, 262 F.Supp.2d 633 (D.Md.2003); *Byrd v. Moore*, 252 F.Supp.2d 293 (D.Mass.2003); *United States v. Serpa*, 251 F.Supp.2d 988 (D.Mass.2003); *Ferguson v. Ashcroft*, 248 F.Supp.2d 547 (M.D.La. 2003); *Howard v. Ashcroft*, 248 F.Supp.2d 518 (M.D.La.2003); *Ashkenazi v. Atty. Gen.*, 246 F.Supp.2d 1 (D.D.C.2003); *United States v. Tkabladze*, Nos. CV 03–01152, CR 02–00434(A) (C.D.Cal. May 16, 2003) (slip op.); *Mallory v. United States*, No. Civ.A. 03–10220–DPW, 2003 WL 1563764 (D.Mass. Mar.25, 2003); *United States v. West*, No. Civ. 03–CV–70239–DT, 2003 WL 1119990 (E.D.Mich.

Charities to pursue its claim, it is therefore reasonably likely that Plaintiff also would succeed. Therefore, the question of standing may well determine the ultimate outcome. As far as this Court can determine, no court has considered this issue.

## II.

■ Plaintiff does not claim that the Comprehensive Crime Control Act of 1984 or its amendments provide a private right of action. Rather, Plaintiff claims a right of review under § 10(a) of the Administrative Procedure Act. *See* 5 U.S.C. § 702. Not every affected party may bring such a claim. Before the Court can entertain it, Dismas Charities must establish that it has standing to bring such a lawsuit. In essence, standing is a question of whether a litigant is entitled to have a court review the merits of a particular issue. It is founded out of concern for the properly limited role of courts in our society and a desire to have properly interested parties litigating federal administrative challenges. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Consequently, the Supreme Court has said that a plaintiff invoking the APA must demonstrate prudential standing in addition to the regular requirement, imposed by Article III of the Constitution, that a plaintiff must have suffered "sufficient injury in fact." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) [hereinafter *NCUA* ]; *see also Courtney v. Smith,* 297 F.3d 455, 460–61

Feb.20, 2003); *McDonald v. Fed. Bureau of Prisons,* No. 03–CV–235 (N.D.Ga. Feb. 14, 2003); *United States v. Canavan,* No. CR. 00–276 (JRT/FLN), 2003 WL 245226 (D.Minn. Jan. 22, 2003)).

**4.** In this case, the Court need not consider Article III standing because the issue of prudential standing is dispositive.

(6th Cir.2002); *Cmty. First Bank v. Nat'l Credit Union Admin.,* 41 F.3d 1050, 1054 (6th Cir.1994). Prudential standing concerns a stricter set of "judicially self-imposed limits on the exercise of federal jurisdiction." *Bennett v. Spear,* 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks omitted). The Court now addresses prudential standing.[4]

### A.

Not everyone affected by government actions or by a change in government regulations has the right to challenge their substance or the procedures used to initiate them. In *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Supreme Court first employed the "zone of interest" test, which now governs the prudential standing analysis. Under this test, a party must demonstrate that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. 827. Since then, the Supreme Court has periodically attempted to offer additional guidance for courts trying to fathom the meaning of the "zone of interest" test. *See NCUA,* 522 U.S. at 488–92, 118 S.Ct. 927; *Bennett,* 520 U.S. at 162–63, 117 S.Ct. 1154; *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 396–400, 107 S.Ct. 750, 93 L.Ed.2d 757. (1987).[5] Notwithstanding

**5.** The Sixth Circuit has recognized and explained the test in subsequent cases. *Courtney,* 297 F.3d at 461; *Cmty. First Bank,* 41 F.3d at 1054. In an opinion later affirmed by the Supreme Court in *NCUA,* the D.C. Circuit has also stated a helpful articulation of the "zone of interest" test: "Litigants can qualify as 'protected' by a statute if they are intended beneficiaries of the legislation or are nevertheless what we have termed suitable challengers; that is, if their interests are suffi-

these efforts, the application of the "zone of interest" test in a particular instance remains akin to reading congressional tea leaves.

These Supreme Court cases confirm that the "zone of interest" test is meant to be applied broadly. *Clarke,* 479 U.S. at 399, 107 S.Ct. 750. "[I]f the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit," then they are outside the "zone of interest." *Id.* Further, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400, 107 S.Ct. 750. Rather, in applying the "zone of interest" test, the court "first discern[s] the interests 'arguably . . . to be protected' by the statutory provision at issue," and then the court "inquire[s] whether the plaintiff's interests affected by the agency action in question are among them." *NCUA,* 522 U.S. at 492, 118 S.Ct. 927.

 In applying the test, the Supreme Court has looked at congressional intent, including "all indicators helpful in discerning that intent," to determine whether the plaintiff falls within the "zone of interest." *Clarke,* 479 U.S. at 400, 107 S.Ct. 750. In order to accomplish this, the Supreme Court has relied upon the legislative history surrounding the statute in question. *See NCUA,* 522 U.S. at 492–95 & n. 6, 118 S.Ct. 927; *Air Courier Conference of Am. v. Am. Postal Workers Union,* 498 U.S. 517, 524–28, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991); *Clarke,* 479 U.S. at 401, 107 S.Ct. 750. The application of this test is particularly difficult because courts are re-

quired to assess the group of interests that Congress sought to protect or promote by enacting the statute. Judges are often required to fathom the meaning of words from general intent; here, one must speculate about the extent to which Congress intended to benefit or regulate certain groups. Performing this task is not easy and, indeed, is somewhat contrary to the inclination of courts. It requires a common sense assessment of whether the interests that a party seeks to protect are remotely similar to those that Congress sought to promote.

This Court will therefore first determine which interests are arguably protected under the statutory provision in question, 18 U.S.C. § 3621(b).

### B.

Section 3621 of the Comprehensive Crime Control Act of 1984 replaced 18 U.S.C. § 4082, which had previously given authority to the Attorney General to assume custody of offenders and designate their place of imprisonment. Pub.L. No. 98–473, § 218(a)(3), 98 Stat. 1837 (1984) (repealing 18 U.S.C. § 4082(a), (b)). Section 3621(b) gives BOP the discretion to designate the place of an offender's imprisonment. The statute authorizes BOP to select any correctional facility provided it "meets minimum standards of health and habitability" and outlines several factors for BOP to consider in choosing a facility.

As Plaintiff asserts, when Congress first amended § 4082 in 1965, it envisioned using community correction facilities to confine offenders, and it authorized the Attorney General to transfer prisoners to such

ciently congruent with those of the intended beneficiaries that the litigants are not 'more likely to frustrate than to further the statutory objectives.'" *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.,* 988 F.2d 1272, 1275 (D.C.Cir.1993) (citing *Clarke* ) (citation

omitted), *aff'd,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998). In *Community First Bank,* the Sixth Circuit likewise recognized the D.C. Circuit's holding in *First National Bank & Trust Co.* 41 F.3d at 1054.

centers. S.Rep. No. 89–613 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3076, 3077–78. However, when Congress amended § 4082 again in 1984, it intended to change the administration of the prison system, giving BOP custody over prisoners and control over designation of the place of imprisonment. *See* S.Rep. No. 98–225, at 141–42 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3324–25. Section 3621(b) gives BOP the sole discretion to select where offenders serve their sentences and to ensure those facilities meet certain living standards. S.Rep. No. 98–225, at 141, *reprinted in* 1984 U.S.C.C.A.N. at 3324 ("Proposed 18 U.S.C. 3621(b) follows existing law in providing that the authority to designate the place of confinement for federal prisoners rests in the Bureau of Prisons.... Existing law provides that the Bureau may designate a place of confinement that is available, appropriate, and suitable. Section 3621(b) continues that discretionary authority with a new requirement that the facility meet minimum standards of health and habitability established by the Bureau of Prisons.") (footnotes omitted).

While Congress did include community correction centers among the types of facilities to which BOP could send prisoners, in implementing § 3621(b), its primary concern was to reassign authority for managing the prison population and designating their place of incarceration. Congress seemed concerned only with ensuring that the facilities met "minimum standards of health and habitability." In this way, Congress intended to ensure that prisoners had decent living situations and appropriate treatment programs. S.Rep. No. 98–225, at 141, *reprinted in* 1984 U.S.C.C.A.N. at 3324. All of these references suggest Congress's concern for protecting the interests of BOP by strengthening its jurisdiction and the interests of prisoners by regulating living conditions. These were the interests that Congress

"arguably" intended to protect under § 3621(b). Congress did not regulate or restrict those who sought to operate community correction centers. Nor did Congress dictate the types of contractual arrangements into which BOP might enter in order to provide suitable community correction center space for offenders.

Having determined the interests that Congress intended to protect under § 3621(b), the Court will now consider whether Plaintiff's interests are among them.

## C.

■ Dismas Charities need not show that Congress specifically had its interests in mind to qualify for standing. *Clarke,* 479 U.S. at 399–400, 107 S.Ct. 750. The Court must find, however, that it can "reasonably be assumed" that, in enacting § 3621(b), "Congress intended to permit" an organization like Dismas Charities to challenge BOP's discretion to designate a prisoner's place of confinement. *Id.* at 399, 107 S.Ct. 750. To make such an assumption is beyond this Court's reasoned logic. No doubt Congress envisioned that an organization like Dismas Charities would receive federal prisoners. Under the statute, however, Congress was concerned with changing the administration of the prison system, not with whatever indirect effect such a change might have on government contractors in the correctional facility industry. Section 3621(b) gives BOP complete control over where to send prisoners. Federal offenders are the only other group, apart from BOP, to whom the Court can "reasonably" assume Congress intended to grant permission to sue.

Likewise, the Court does not find that Dismas Charities is a "suitable challenger," or that its "interests are sufficiently congruent with those of the intended bene-

ficiaries," namely BOP or prisoners. *See First Nat'l Bank & Trust Co.*, 988 F.2d at 1275. The Court assumes that Dismas Charities believes in its programs and the benefit it provides to inmates. Plaintiff's primary interest, however, is to ensure that BOP continues sending Plaintiff's prisoners to support its programs and to remain financially afloat. BOP's primary interest is in preserving its broad authority to designate the place of imprisonment for each inmate. Where BOP exercises its discretion to the detriment of community correction facility operators, as in the present case, these interests would conflict. Plaintiff's interest in maintaining a steady flow of inmates also could well conflict with the prisoner's interests in ensuring that BOP complies with minimum standards of health and habitability. The type of facility that Plaintiff or a similar community correction facility operator and that BOP might consider suitable for the prisoner might be different from what the prisoner considers appropriate health and habitability conditions.

For these reasons, the Court finds that Plaintiff's interest is not among those that Congress specifically intended to protect. Indeed, its interests appear only collateral to the true focus of the statute.

## D.

An overview and comparison with the relevant cases confirms this view. Plaintiff's situation seems more akin to those where the Supreme Court has found an absence of standing.[6] In *Lujan v. National Wildlife Federation*, for instance, the Supreme Court stated that, in the case where an agency fails to comply with a statute requiring "on the record" hearings, granting standing to the court reporters affected by the statute would be improper. 497 U.S. at 883, 110 S.Ct. 3177. While the agency's failure to comply with the statute "would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings," the company does not have standing because the statute "was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters." *Id.* Similarly, in *INS v. Legalization Assistance Project*, Justice O'Connor, sitting as Circuit Justice, found that an organization providing legal assistance to immigrants did not have standing to sue the INS over its interpretation of a statute granting amnesty to certain illegal immigrants. 510 U.S. 1301, 1305, 114 S.Ct. 422, 126 L.Ed.2d 410 (1993) (O'Connor, J., Circuit Justice). O'Connor found that the statute "was clearly meant to protect the interests of undocumented aliens" and that there was "no indication that [the statute] was in any way addressed to [the aid organization's] interests." *Id.* She stated that "[t]he fact that the INS regulation may affect the way an organization allocates its resources," such as an employer who hires or a landlord who rents apartments to illegal immigrants, "does not give standing to an entity" outside the statute's zone of interests. *Id.*

Plaintiff is very similarly situated to the challengers in the *Lujan* hypothetical and *Legalization Assistance Project.* Dismas

---

**6.** The Court recognizes that the situations cited in *Lujan v. National Wildlife Federation* and *INS v. Legalization Assistance Project* are not necessarily binding precedent. The *Lujan* hypothetical was dictum. O'Connor's opinion in *Legalization Assistance Project* was merely a prediction on a vote of certiorari to the Supreme Court were the court of appeals in the case to affirm the district court's order requiring the INS to make certain changes to the amnesty process. Nonetheless, the Court finds the Supreme Court's analysis of these two situations, which are factually very similar to the case before the Court, to be instructive and certainly persuasive.

Charities is economically dependent upon its federal government contracts. When BOP cancels them, Dismas is affected in much the same way as the court reporters and the legal aid project—i.e., all three groups lose business. In both *Lujan* and *Legalization Assistance Project*, Congress enacted the statutes at issue to protect the interests of other groups, parties to agency proceedings and illegal immigrants, respectively, rather than those of the plaintiffs. The same is true here. Congress enacted § 3621(b) to benefit and regulate BOP, not third-party organizations who contract with BOP to house prisoners, provide prison meals, or offer rehabilitation programs.

The Court finds the present circumstances distinguishable from a series of cases in which the Supreme Court permitted an entity to challenge federal regulations "even if the plaintiff's interest [was] not precisely the one that Congress sought to protect." *First Nat'l Bank & Trust Co.*, 988 F.2d at 1277; *see, e.g., NCUA*, 522 U.S. at 492–99, 118 S.Ct. 927 (allowing banks to sue on regulation concerning common bond requirement for credit union membership); *Clarke*, 479 U.S. at 401–03, 107 S.Ct. 750 (allowing securities trade association to sue in case where regulation permitted banks to offer discount brokerage services under statute that restricted a bank's branching activities); *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620–21, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (allowing mutual fund companies to sue on regulation permitting banks to offer same services in contradiction to statute restricting bank activities to bank services); *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 155–56, 90 S.Ct. 827 (same holding involving data processing companies). Like Dismas Charities, these challengers were not specifically mentioned in the statutory provision at issue. Unlike Plaintiff, however, each of these entities had an interest in restricting a particular industry's ability to compete, which coincided with Congress's regulatory intent. Though their motives of self-interest might be different from an interest in consumer protection, which presumably motivated Congress in a few of these cases, the Supreme Court has said that a difference in motive "is beside the point." *NCUA*, 522 U.S. at 499, 118 S.Ct. 927.

Based on this analysis, the Court finds that the interests of Dismas Charities are quite distinct from those that Congress sought to benefit or regulate under § 3621(b). Plaintiff therefore lacks prudential standing to challenge BOP's change in regulation.

The Court will enter an order consistent with this Memorandum Opinion.

## ORDER

Each party has filed a dispositive motion. The Court has issued a Memorandum Opinion setting forth its analysis. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Plaintiff's motion is DENIED; Defendant's motion is SUSTAINED; and all claims against Defendant are DISMISSED WITH PREJUDICE.

This is a final and appealable order.