**FIRST NATIONAL BANK OF LEXINGTON, TENNESSEE,**
**Plaintiff–Appellant,**

v.

**James C. SANDERS, Administrator,**
**Small Business Administration,**
**Defendant–Appellee.**

**No. 90–5717.**

United States Court of Appeals,
Sixth Circuit.

Argued July 25, 1991.

Decided Aug. 19, 1991.*

---

* This decision was originally issued as an "unpublished decision" filed on August 19, 1991.

J. Alan Hanover (briefed), Stephen R. Leffler (argued and briefed), Hanover, Walsh, Jalenak & Blair, Memphis, Tenn., for plaintiff-appellant.

W. Hickman Ewing, Jr., U.S. Atty., Joe A. Dycus, Asst. U.S. Atty., Office of the U.S. Atty., Memphis, Tenn., Steve Cramer, Omaha, Neb., Mark K. Stephens, Gary Fox (argued and briefed), Washington, D.C., for defendant-appellee.

Before GUY and RYAN, Circuit Judges, and KRUPANSKY, Senior Circuit Judge.

On September 27, 1991, the court entered an order designating the opinion as one recommended for full text publication.

1. Since the initiation of this suit, FNBL has gone into receivership. FNBL moved to delay oral argument to allow the Federal Deposit Insurance Corporation (FDIC), its successor in interest, to intervene. Since that time, FDIC notified the court of its intent not to intervene. Defendant has raised an argument questioning

PER CURIAM.

Plaintiff, First National Bank of Lexington, Tennessee (FNBL), appeals the district court's grant of summary judgment in favor of defendant, James Sanders, Administrator, Small Business Administration (SBA), on its claim for interest payments on a series of loans guaranteed by defendant.[1] For the reasons below, we affirm.

## I.

This litigation involves two interrelated cases arising out of the purchase by FNBL of a series of six commercial loans with fluctuating interest rates from primary lenders. Each of these loans were secured by a guarantee from the SBA and consisted of a package which generally included a note, a loan authorization, a Secondary Participation Guaranty Agreement, and an assignment from the prior holder. The Secondary Participation Guaranty Agreement is drafted by the SBA and governs the relationship between the SBA and any subsequent holder of the note, which in the present case is FNBL. In particular, these agreements govern the repurchase procedure of the note in the event that a borrower defaults and the SBA must guarantee the loan.

In each of the six loan payments at issue in the present case, the FNBL was the holder of an SBA guaranteed loan, the borrower defaulted, and the SBA repurchased the loan from FNBL. The only item in dispute is the rate of interest on these loans which the SBA must pay to FNBL.

The documentation for the loans states that the fluctuating interest rate was to

whether FNBL is still a proper party. Although the argument has merit, we have elected to address the merits of the dispute since we fear that the questions raised by this appeal will not go away if a different party is substituted as plaintiff. As to whether there is, in fact, another party that could be substituted for the present plaintiff, we were not presented with a record upon which a determination of that nature could be made.

freeze "as of the date of default" or, in two of the cases, "as of the initial date of default." According to the SBA, the meaning of this language is to be interpreted under the agency's Standard Operating Procedures 50–50–3A, ¶ 79(e)(4)(A), meaning the date of the first *uncured* default. In contrast, FNBL claims that the date of default should be the first date upon which a partial or full payment became past due and was not made.

In repurchasing the guaranteed loans from FNBL, the SBA treated five of the loans according to its Standard Operating Procedure, and paid FNBL at a lower interest rate than that which FNBL claimed was owed. In each of these cases, FNBL reserved its right to contest these payments. In the case of the loan relating to T.D. Johnson, the SBA paid FNBL at the higher rate and sued for return of what it claimed was the overpayment of interest. The SBA also deducted from its payment on this loan a "servicing fee" in the amount of $3,200. FNBL counterclaimed for return of the "servicing fee." FNBL subsequently initiated this suit for payment of the money it says it is entitled to on the basis of the calculations of the payment of these loans at the higher interest rate as well as for return of the servicing fee. All six cases were consolidated.

Both sides moved for summary judgment. The district court granted partial summary judgment for the SBA, holding that the date of default is to be interpreted as the SBA states in its Standard Operating Procedure. The case was then referred to a magistrate judge, who subsequently recommended summary judgment be granted in favor of the SBA on FNBL's claims for interest. It further recommended that judgment be awarded to the SBA in the amount of $20,888.62 in the matter of the T.D. Johnson loan. The district court adopted this recommendation, and it is from this ruling that plaintiff appeals.

## II.

Plaintiff asserts that the defendant has overstepped his authority under the rules governing the SBA's repurchase of loans. It suggests that while the administrator of the SBA has a certain amount of discretion and is entitled to promulgate rules within the purposes of the Small Business Act of 1958, he must do so under the procedures set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 553(b). To this end, FNBL suggests first, that the SBA's Standard Operating Procedure regarding loan default dates did not meet the APA procedural requirements because it was adopted without compliance with the notice and hearing requirements of the APA; and second, that the SBA guarantees of the loans should be interpreted according to ordinary commercial business practices, which are consistent with plaintiff's interpretation of the default language. We find both arguments to be unpersuasive.

The regulations governing the SBA's purchase of loans and the interest rate it pays upon purchase are found in 13 C.F.R. § 120.202–4. This language states, in pertinent part:

> When SBA purchases its guaranteed share, its payment to the holder of accrued interest to the date of purchase shall be at the rate of interest provided in the note. On those loans with a fluctuating interest rate, the SBA's payment of accrued interest shall be at that rate in effect at the time of default when a default has occurred, or at the rate in effect at the time of purchase where no default has occurred.

The language in each of the loan agreements is in general conformity with this language. In addition, each of the Secondary Participation Guaranty Agreements relating to the loans in question specifically refers to and incorporates the SBA's Loan Guaranty Agreement which states: "This agreement shall cover only loans duly approved hereafter for guaranty by Lender and SBA subject to SBA's Rules and Regulations as promulgated from time to time."

In 1983, the SBA adopted the rule at issue in its Standard Operating Procedure. The relevant portion of that rule states:

SBA's rules and regulations provide, as an automatic part of the purchase procedure, that the interest rate on variable rate loans will be "frozen" at the rate outstanding at the time of the first uncured default (date of purchase if no outstanding default).

FNBL asserts that the SBA violated section 553 of the APA, by failing to give notice of its proposed rulemaking and failing to offer an opportunity to interested persons to comment on this rule. The language of section 553 states in pertinent part:

> (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law....
>
> ....
>
> Except when notice or hearing is required by statute, this subsection does not apply—
>
> (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
>
> (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issues) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b).

As the language of section 553(b)(A) makes clear, the statute offers an exception to the notice and hearing requirements for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." Defendant asserts that its Standard Operating Procedure rule falls into this category and therefore requires no notice or public review. We agree.

In visiting this general issue previously, this court noted that there is "no bright line that separates the two types of rules[,]" interpretive or legislative. *Fried-rich v. Secretary of Health & Human Servs.*, 894 F.2d 829, 834 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 59, 112 L.Ed.2d 34 (1990). We adopted language from the D.C. Circuit, which regularly deals with this type of interpretive question, to assist us in identifying "certain general principles" concerning this area of the law:

> First, the agency's own label, while relevant, is not dispositive.... An interpretative rule simply states what the administrative agency thinks the statute means, and only " 'reminds' affected parties of existing duties." ... On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule.

*Id.* (quoting *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C.Cir. 1984), *cert. denied*, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985).

In *Friedrich*, the issue was whether a ruling by the Secretary of Health and Human Services that a certain medical therapy he determined was not "reasonable and necessary for the diagnosis or treatment" of the claimant's illness was a legislative rule requiring notice and comment under the APA. This court concluded that the Secretary's determination "did not represent a departure from a previous evaluation of this medical procedure." *Friedrich*, 894 F.2d at 836. It created "no new law," but only "interprets the statutory language ... as applied to a particular medical service or method of treatment." *Id.* at 837.

Similarly, in *Southern California Edison Co. v. Federal Energy Regulatory Commission*, 770 F.2d 779 (9th Cir.1985), the court held that the new regulations pertained to the procedural aspects of FERC's approval of rates and that a final rule promulgated by FERC establishing those procedures was not subject to the notice and comment requirement of the APA. The court stated:

> For purposes of the APA, substantive rules are rules that create law. These rules usually implement existing law, im-

posing general, extrastatutory obligations pursuant to authority properly delegated by Congress. Interpretative rules merely clarify or explain existing law or regulations and go " 'to what the administrative officer thinks the statute or regulation means.' "

*Id.* at 783 (citations omitted). *See also New York v. Lyng,* 829 F.2d 346 (2d Cir. 1987) (ruling that Secretary of Agriculture's determination that restaurant allowance for food stamp recipients was income was an interpretive rule exempt from the notice and comment requirement of the APA); *Chula Vista City School Dist. v. Bennett,* 824 F.2d 1573 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988) (holding that a $50 rule used by the Secretary of Education to evaluate applications for Impact Aid by local school districts was not subject to the notice and comment procedures of the APA because it was an interpretive rule, describing "the agency's view of the meaning of a statute").

FNBL suggests that the proper method for determining whether the Standard Operating Procedure is an interpretative regulation or a legislative rule is the "substantial impact" test, formulated in *Pharmaceutical Manufacturers Association v. Finch,* 307 F.Supp. 858 (D.Del.1970). In that case, the Pharmaceutical Manufacturers Association sought an injunction against the Secretary of Health and Human Services in an effort to prevent him from relying on regulations promulgating new standards of evidence necessary to demonstrate the effectiveness of drug products and applying those standards retroactively. The court concluded that, because the regulations were "all pervasive," had a "substantial impact" upon the drug industry, and "prescribed in specific detail, for the first time, the kinds of clinical investigations that will be deemed necessary to establish the effectiveness of existing and future drug products," it was necessary for the Commissioner to comply with the notice and comment provisions of the APA.

Plaintiff also cites to *Batterton v. Marshall,* 648 F.2d 694 (D.C.Cir.1980). In *Batterton,* the court held that modification of the Department of Labor's method of calculating unemployment statistics which trigger emergency job program allocations under the Comprehensive Employment and Training Act, must be promulgated in compliance with the notice procedures under the APA. The court concluded that the changes instituted reflected not simply the future intention of the Department but a change in substantive rights and interests.

In applying these holdings to the facts in the instant case, we agree with the district court that the Standard Operating Procedure in question was merely interpretative and did not establish new procedures or rules. Testimony by the SBA's deputy associate administrator for financial assistance revealed that the SBA had defined "date of default" in the manner described since approximately 1978; it was adopted in the Standard Operating Procedure on October 4, 1983. This rule merely clarifies the language of section 120.202–4 of the Code of Regulations so that this regulation can be applied consistently. It does not "change[ ] existing rights and obligations," *Lyng,* 829 F.2d at 353, nor institute a new procedure, as was the case in *Batterton* and similar cases cited by plaintiff.[2]

---

2. We note additionally that the substantive impact test cited by plaintiff has been disfavored recently by this and other courts. In *Friedrich,* 894 F.2d at 836, for instance, this court stated:

At an earlier time, substantial impact was treated by a number of courts as an important factor in deciding whether a rule was legislative or interpretative. More recent cases have held that the level of impact on interested parties is not a factor in correctly classifying a rule or regulation. This court recognized the substantial impact argument in *State of Ohio [Dep't of Human Servs. v. United States Dep't of Health and Human Servs.,* 862 F.2d [1228] at 1233–34 [6th Cir.1988]], but chose not to make impact a basis for its characterization of the rule it was considering. We think this approach is sound in the present case. Any determination by the Secretary regarding rules for Medicare reimbursement eligibility, regardless of how it is promulgated, will have a substantial impact on a large number of people. The extent of the impact is not an indicative factor in our search for the proper characterization of the national coverage determination.

As the district court noted, "[t]he standard of review of the interpretation of an administrative regulation is strict. The administrative interpretation is of controlling weight, unless it is plainly erroneous or inconsistent with the regulation." (Citing *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Compton v. Tennessee Dep't. of Pub. Welfare*, 532 F.2d 561 (6th Cir.1976)). We do not find the SBA's interpretation of this administrative regulation to be inconsistent or plainly erroneous.

FNBL's allegations that the SBA's interpretation of the default language contradicts ordinary commercial and business practices and was instituted by the SBA solely to avoid a disadvantageous interest rate is unsupported. FNBL suggests that it is improper to accept as dispositive the testimony of the SBA's deputy administrator that the definition of "date of default" is properly reflective of standard commercial practices. However, FNBL offers no evidence of any contrary practice by the SBA or other institutions prior to the transactions involved in the present case.[3]

FNBL does cite one case, *Gideon v. Administrator, United States Small Business Administration*, 630 F.Supp. 822 (D.Me.1986), which purportedly supports its argument. In *Gideon*, the Maine district court held that the interest rate limitation on direct SBA loans was inapplicable to deferred participation loans. The plaintiff in that case, Erebus, entered into a loan agreement whereby the SBA guaranteed a $270,000 loan by Oxford Bank to Erebus. Gideon executed a primary note on behalf of Erebus to Oxford. The note initially carried an interest rate of 9.5 percent, but was to be adjusted quarterly so as to remain at two percent above the prime rate. The language of the agreement concerning

incidence of default was similar to the instant case: "[T]he rate of interest on both the guaranteed and unguaranteed portion thereof shall become fixed at the rate in effect as of the date of default." *Id.* at 823.

Erebus subsequently defaulted when the rate of interest was at 21.5 percent. The SBA then assigned the promissory note to Oxford and purchased its guaranteed portion of the outstanding principal balance. In accordance with the Loan Authorization Agreement, the SBA continued to charge Erebus the 21.5 percent interest rate that was being charged by Oxford at the time of the default. *Id.* at 824. Gideon sought a determination that the SBA had charged excessive interest on the Erebus note since the date of default. Gideon argued that continuing to charge the 21.5 percent interest rate put the SBA in conflict with another of its regulations which set a "cap" on the interest that could be charged. The district court resolved the issue in favor of the SBA, finding that the "cap" provision was applicable to direct participation loans but not deferred participation loans.

We find no conflict with the holding in *Gideon* and our decision today. *Gideon* did not address the issue of cured defaults, nor do the facts indicate that there was an initial default that was subsequently cured. Plaintiff did not challenge the date of the default but rather the SBA's right to continue to charge the interest rate in effect on that date.

AFFIRMED.

---

*Id.* (citation omitted). This analysis is equally applicable to the present case. Notwithstanding the holding of *Friedrich*, however, we believe that, even if the substantial impact test is employed, the adoption of the regulation in question does not mandate a review under the notice and comment requirements of section 553.

**3.** We also note that the interpretation urged by FNBL is highly opportunistic in that it would only urge such a construction when interest rates went *down* after the first default. If interest rates had risen during the period when a debtor was curing previous defaults, FNBL would not be making the argument it does now.