*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0128p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DISMAS CHARITIES, INC.,

　　　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL
BUREAU OF PRISONS,

　　　　　　　　　*Defendant-Appellee.*

No. 03-6502

>

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00158—John G. Heyburn II, Chief District Judge.

Argued: September 22, 2004

Decided and Filed: March 11, 2005

Before: SILER, BATCHELDER, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** James R. Adams, FROST, BROWN & TODD, Cincinnati, Ohio, for Appellant.
Michael E. Robinson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee. **ON BRIEF:** David S. Kaplan, Sheryl G. Snyder, FROST, BROWN & TODD,
Louisville, Kentucky, for Appellant. Michael E. Robinson, Michael Jay Singer, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

---

　　　　ROGERS, Circuit Judge. Dismas Charities, Inc. appeals the district court's dismissal of its
challenge to a Bureau of Prisons policy that reduced the number of federal prisoners eligible to serve
all or part of their sentences in a community correction center. Dismas's interests do not fall within
the zone of interests protected by the primary basis for their challenge to the policy, 18 U.S.C.
§ 3621(b). Moreover, while Dismas does have standing under the notice and comment requirements
for informal rulemaking contained in § 553 of the Administrative Procedure Act ("APA"), its
alternative claim brought under that section fails as a matter of law. Accordingly, we affirm.

## I.  Introduction

Dismas Charities, Inc. ("Dismas") filed suit on March 10, 2003, seeking declaratory and injunctive relief against the Bureau of Prisons ("BOP").  The controversy stems from a recent change in the BOP's interpretation of 18 U.S.C. § 3621(b), which governs the BOP's assignment of federal prisoners.  The new interpretation curtails the circumstances in which federal prisoners are eligible to serve all or part of their sentences in a community correction center ("CCC").[1] Dismas alleges that the new interpretation of § 3621(b) is arbitrary and capricious, and that before changing its interpretation of § 3621(b), the BOP failed to abide by the notice and comment provisions contained in § 553 of the Administrative Procedure Act.[2]  The district court dismissed Dismas's claims, finding that Dismas was not within the zone of interests protected by § 3621(b), and therefore lacked standing.  Dismas appeals the dismissal, arguing that its mission and values are within the zone of interests protected by § 3621(b).

We affirm the district court's judgment.  Dismas lacks standing under § 3621(b) because it is not within the zone of interests sought to be protected by Congress when enacting the statute. Although this does not dispose of Dismas's claim under § 553 of the APA, for which Dismas does have standing, the latter claim fails because the APA does not require notice and comment in the circumstances alleged in this case.

## II.  Background

Dismas Charities, Inc. is a nonprofit corporation that owns and operates eighteen CCCs in seven states.  The majority of Dismas CCCs house only federal inmates.  CCCs, such as Dismas, provide an alternative to traditional incarceration and attempt to facilitate the successful transition of prisoners back into society.  While in a CCC, offenders must obtain employment, pay fines, restitution, child support, and subsistence, establish a budget, save money, and, if applicable, seek treatment of substance abuse and mental health issues, as well as attend classes in life skills, anger management, and wellness.

The Department of Justice's Bureau of Prisons chooses which inmates are sent to Dismas facilities.  Before the change in policy, Dismas received two types of inmates—those on the "front end" of their sentences and those on the "back end."  Front end placements usually involve offenders with relatively short sentences who serve their entire sentence at the CCC.  Back end designations, by contrast, involve prisoners who have served the majority of their sentences in prison, but are sent to a CCC for a time before their release in order to provide transition of the offender back into society.

18 U.S.C. § 3621(b) grants the BOP discretion to designate a prisoner's place of incarceration in "any available penal or correctional facility that meets minimum standards of health and habitability . . . ."  On March 25, 1992, the Department of Justice's Office of Legal Counsel ("OLC") issued an opinion that interpreted § 3621(b) to allow the BOP unlimited authority to place prisoners in any appropriate facility for incarceration, including those operated by the private sector. 16 Op. Off. Legal Counsel 65, 67 (1992).

---

[1] CCCs are also known as "halfway houses."

[2] The First and Eighth Circuits have held that the BOP's new interpretation of §3621(b) is contrary to the plain meaning of the statute and therefore invalid.  *Goldings v. Winn*,  383 F.3d 17, 28-29 ( 1st Cir. 2004); *Elwood v. Jeter*, 386 F.3d 842, 847 (8th Cir. 2004).  In *Goldings* and *Elwood*, the plaintiffs had standing because they were federal prisoners who fell within the zone of interests of § 3621(b).

On December 13, 2002, however, the OLC changed its interpretation of §3621(b). Op. Off. Legal Counsel, slip. op., 2002 WL 31940146 (December 13, 2002). The OLC determined first that U.S.S.G. §5C1.1 did not permit the BOP to substitute confinement in a CCC for a minimum term of imprisonment imposed under that guideline. The OLC also concluded that § 3621(b) does not give the BOP general authority to place an offender in community confinement from the outset of his sentence or to transfer the offender from prison to community confinement at any time the BOP chooses during the course of the offender's sentence. Instead, under the new interpretation of § 3621(b), front end placements are not authorized and back end offenders are only eligible for confinement in CCCs for the lesser of (i) ten percent of their sentence or (ii) six months—periods specifically authorized by 18 U.S.C. § 3624(c) (2000). The OLC reasoned that, while § 3621(b) gave the BOP the discretion to choose an inmate's place of imprisonment generally, a CCC did not constitute a place of imprisonment for purposes of that section. Op. Off. Legal Counsel, 2002 WL 31940146 (December 13, 2002). Instead, the OLC determined that the authority to transfer a prisoner to a CCC came solely from § 3624(c), which limits the time a prisoner may spend in a CCC to "a reasonable part, not to exceed six months, of the last 10 per centum of the term." *Id.*

Shortly after the 2002 OLC opinion was issued, a memorandum written by Deputy Attorney General Larry Thompson instructed the BOP to transfer all offenders residing in CCCs with more than 150 days remaining on their sentence to a traditional prison facility because the use of CCCs was "unlawful." Memorandum of Deputy Attorney General Larry D. Thompson, December 16, 2002, at 1. The operative language of the Thompson memorandum is as follows:

> OLC has now issued a formal opinion finding that BOP's policy is unlawful. Accordingly, BOP immediately should take all steps necessary to ensure that its sentencing placement decisions are in full compliance with the governing law. In addition, BOP should transfer to an actual prison facility all federal offenders currently residing in a CCC who, as of today, have more than 150 days remaining on the imprisonment component of their sentence. BOP shall give at least 30 days written notice to each such offender prior to the transfer.

*Id.* The Thompson memorandum proceeded to describe the conclusions of the OLC memorandum. *Id.* at 1-2. The Thompson memorandum concluded by explaining that a concern regarding the BOP's previous CCC placement policy was its "potentially disproportionate, and inappropriately favorable, impact on so-called 'white-collar' criminals." *Id.* at 2-3.

On December 20, 2000 the Director of the BOP issued a memorandum to all federal judges stating that the BOP would no longer honor judicial recommendations to place inmates in CCCs for the imprisonment portions of their sentences. Memorandum of BOP Director Kathleen Hawk Sawyer, December 20, 2002, at 1. "Effective immediately, this practice will no longer be followed. The Bureau will not use CCCs as a substitute for imprisonment." *Id.* The memorandum explained briefly:

> This procedure change follows recent guidance from the U.S. Department of Justice's Office of Legal Counsel (OLC), finding that the term "community confinement" is not synonymous with "imprisonment." OLC has determined that the Bureau's practice of using CCCs as a substitute for imprisonment contravenes well-established caselaw, and is inconsistent with U.S.S.G. § 5C1.1.

*Id.*

The change in the interpretation of § 3621(b) has had a severe impact on Dismas. For example, in the time period between January 2001 and May 2003, the number of front end offenders

housed at CCCs operated by Dismas was drastically reduced, resulting in a revenue loss of $467,315. The number of back end prisoners was also reduced, resulting in a loss of revenue of $121, 351. In addition, the BOP cancelled the designations of many back end prisoners from January to May 2003 for an additional loss of $625,933 in revenue. All told, the lost revenue amounted to $1,214,599. Dismas further argues that the BOP instruction interferes with its ability to help prisoners adjust to life outside prison, contending that offenders need at least 90-120 days in a CCC to adjust to outside life. Under the new policy, only people sentenced to imprisonment for 60 months or more can benefit from six months in a CCC, and many prisoners with sentences of less than 60 months would not be able to stay at a CCC for the necessary 120 days.

## III. Standing

Dismas argues that the BOP's new interpretation of § 3621(b) is unlawful because the new interpretation was arbitrary and capricious, and because the BOP did not comport with the notice and comment requirements for informal rulemaking contained in § 553 of the APA. The district court did not reach the merits of these claims; instead, it dismissed the suit after finding that Dismas lacked standing.

We review *de novo* a district court's decision to dismiss a case for lack of standing. *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002). "'For purposes of ruling on a motion to dismiss for lack of standing, a complaint must be viewed in the light most favorable to the plaintiff; all material allegations of the complaint must be accepted as true.'" *Id.* (quoting *Am. Fed'n of Gov't Employees v. Clinton*, 180 F.3d 727, 729 (6th Cir. 1999)). However, "the plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

While the standing requirements imposed by Article III of the Constitution require a plaintiff to suffer a sufficient injury in fact, § 10 of the APA requires that the plaintiff also demonstrate that it has prudential standing. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.* ("*NCUA*"), 522 U.S. 479, 488 (1988); 5 U.S.C. § 702. Prudential standing requires "the interest sought to be protected by the complainant [to be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). The Supreme Court has summarized the zone-of-interests test as

> a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987) (footnote omitted). "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . , but by reference to the particular provision of law *upon which the plaintiff relies*." *Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (emphasis added).

The district court found that Dismas lacked prudential standing under § 3621(b) because its interests fall outside of the zone of interests protected by § 3621(b). Dismas, however, argues that its mission and values are the same interests advanced by § 3621(b).[3] Dismas asserts that its mission, as well as the BOP's, is to provide federal prisoners with secure housing and opportunities for self-improvement. Thus, it argues, the BOP's recent interpretation of § 3621(b) restricts the interests Dismas has in helping federal offenders become productive members of society.

Section 3621(b) states, in its entirety:

The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering–
    (1) the resources of the facility contemplated;
    (2) the nature and circumstances of the offense;
    (3) the history and characteristics of the prisoner;
    (4) any statement by the court that imposed the sentence–
        (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
        (B) recommending a type of penal or correctional facility as appropriate; and
    (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.
In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse.

18 U.S.C. § 3621(b). The district court read this language to mean that Congress's primary interest in enacting § 3621(b) was to ensure that the BOP had the appropriate discretionary authority to determine where and in which facility federal inmates will be housed. Dismas, however, relying on legislative history, urges the court also to consider the rehabilitation of prisoners as an interest protected by § 3621(b).[4] According to Dismas, the interests of rehabilitation and the BOP's ability

---

[3]Dismas is founded upon seven values: maintenance of ethical conduct, accountability, integrity and trust; respect, compassion; capacity to change; community is vital to the healing process; healing the human spirit; and self-sufficiency.

[4]Section 3621 replaced 18 U.S.C. § 4082(b) as part of the Sentencing Reform Act of 1984. One of the stated legislative purposes of § 4082 was "to facilitate the rehabilitation of persons convicted of offenses against the United States . . . [by] authorizing the use of residential community treatment centers, emergency furloughs, and community employment or training . . . ." S. REP. 89-613 (1965), *reprinted in* 1965 U.S.C.C.A.N. 3076, 3076. ("The residential community centers, the so-called halfway houses, would make it possible to reintroduce prisoners to the community in a gradual and controlled way."). The BOP acknowledges that the purpose of § 4082 was to facilitate the rehabilitation of federal offenders through the use of CCCs.

The Senate Report discussing the passage of § 3621(b) however refers to 18 U.S.C. § 4082(b) only in general terms:

to have a plethora of choices are interests it also shares, thus making Dismas arguably within the zone of interests protected by § 3621(b).

There is a certain plausibility to Dismas's contention that at least an arguable goal of §3621 is to facilitate the rehabilitation of prisoners. However, even if that is so, it is not sufficient to demonstrate that Dismas has standing. This is because the relevant inquiry under the zone-of-interests test is not whether the overall statute in question furthers goals shared by the plaintiff, but whether *the particular statutory (or regulatory or constitutional) provision relied upon by the plaintiff to win in court* protects the interests of someone in the plaintiff's position. *Bennett*, 520 U.S. at 175-76. This is the relevant inquiry because the zone-of-interests test derives from a statutory codification of the general prudential standing requirement that plaintiffs challenging government action—even those who have Article III injury in fact—may generally litigate only their own rights, and not those of third parties. *See Kowalski v. Tesmer,* —U.S.—; 125 S.Ct. 564 (2004). This limitation is based on the assumption

> that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation. It represents a "healthy concern that if the claim is brought by someone other than one at whom the constitutional protection is aimed," the courts might be "called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."

*Id*. at 567 (internal citations omitted). Of course, the only way to tell whose rights are being litigated is to look at the legal basis for the claim, to see whether that provision protects plaintiff or only someone else.

In the APA context, the prudential standing requirements have been loosened. Prudential standing requirements can be lifted or modified by statute, *F.C.C. v. Sanders Bros. Radio Station*, 309 U.S. 470, 477 (1940); *Bennett*, 520 U.S. at 162, and the Supreme Court has interpreted § 702 of the APA to have loosened prudential standing requirements for suits under the APA. *Data Processing*, 397 U.S. at 157; *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("We have long since rejected [the] interpretation . . . which would have made the judicial review provision of

---

Proposed 18 U.S.C. 3621(a) is derived from 18 U.S.C. §4082(a) except that the new provision places custody of federal prisoners directly in the Bureau of Prisons rather than the Attorney General. This change is not intended to affect the authority of the Bureau of Prisons with regard to such matters as place of confinement of prisoners . . . and correctional programs, but is designed only to simplify the administration of the prison system . . . . Proposed 18 U.S.C. § 3621(b) *follows existing law* in providing that the authority to designate the place of confinement for federal prisoners rests in the Bureau of Prisons. The designated penal or correctional facility need not be in the judicial district in which the prisoner was convicted and need not be maintained by the federal government. Existing law provides that the Bureau may designate a place of confinement that is available, appropriate and suitable. Section 3621(b) continues that discretionary authority . . . . After considering these factors [such as nature and circumstances of the offense, recommendation of the court, etc.], the Bureau of Prisons may designate the place of imprisonment in an appropriate type of facility.
. . . The Committee, by listing factors for the Bureau to consider in determining the appropriateness or suitability of any available facility, does not intend to restrict or limit the Bureau in the exercise of its existing discretion so long as the facility meets the minimum standards of health and habitability.

S. REP. 98-225 at 141-42 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3324-25 (emphasis added.) Dismas argues that the "follows existing law" language in the report harkens back to the rehabilitation goal stated in § 4082. Thus, Dismas urges us to conclude, the legislative history demonstrates that rehabilitation was clearly an interest of § 4082, and this interest did not change when it was recodified as § 3621(b).

the APA no more than a restatement of pre-existing law. Rather we have said that to be 'adversely affected or aggrieved . . . within the meaning' of a statute, the plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint"). Our statutorily-required, loosened inquiry is whether plaintiff is "arguably" within the "zone of interests" of the statute that is the basis for the lawsuit.

With or without § 702 and its gloss from *Data Processing*, however, the prudential standing inquiry requires a clear identification of the relevant provision that is the basis for the lawsuit. The relevant statute for purposes of a zone-of-interests inquiry is not the statute that is challenged by a plaintiff, nor is it the statute that provides the general context for the challenge to agency action, nor even necessarily the statute that authorizes the challenged agency action. It is the statutory (or other legal) provision that the plaintiff points to as the legal basis for arguing against the challenged agency action. Only by first correctly identifying the statutory provision upon which the plaintiff relies can we then ask whether the plaintiff is arguably within the zone of interests protected by that provision. If not even arguably within the zone of interests protected by that provision, the plaintiff is necessarily arguing someone else's rights (if any rights there are), and thereby fails the prudential standing requirement. And it makes no difference if the plaintiff "shares the interests" of the third party in the sense of merely desiring, or even having an economic interest in, having the third party enjoy those rights.

Dismas's contentions in this case boil down to two: (1) the BOP abused the discretion granted to it by §3621(b) by limiting CCC placements, and (2) the BOP was required by APA § 553 to provide notice and opportunity for comment before adopting the policy at issue. In order to determine whether Dismas has prudential standing, we must determine with respect to each of these two different claims what the relevant statutory basis for the claim is, and then determine whether Dismas is arguably within the zone of interests protected by that statutory provision.

## A.  Claim Under § 3621(b)

First with respect to Dismas's abuse of discretion claim, Dismas fails the zone-of-interests test because the grant of discretion given to the BOP to send prisoners to CCCs (under Dismas's view of the statute), while arguably intended to help rehabilitate prisoners, was not even arguably intended to provide a benefit to the CCCs themselves.[5] The policies underlying the zone-of-

---

[5]It might be argued that the relevant statute—the one on which plaintiff bases its §3621 claim—is not really § 3621 but the judicial review provision of the APA, 5 U.S.C. § 706. Section 706 does indeed render reversible agency action that is arbitrary, capricious, or an abuse of discretion. § 706(2)(A). It would however make little sense to look to the statutory purposes underlying § 706 to determine prudential standing in every judicial review case. It is only possible to ascertain that action is arbitrary or capricious by looking at other substantive bases of law. This is particularly so in the instant case, where the core issue is what discretion is given by § 3621. The Supreme Court in *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins*., 463 U.S. 29 (1983), listed a number of types of situations in which agency action might be deemed arbitrary or capricious. These include situations where

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 43. Each of these paradigm examples of arbitrary or capricious action either directly or indirectly implicates agency action based on illegal considerations. It is substantive law that makes such considerations illegal, and ultimately it is such law that forms the basis for an "arbitrary or capricious" APA challenge. Therefore it is to such law that we must look to resolve a zone-of-interests standing issue with respect to substantive "arbitrary or capricious" judicial review under the APA. While § 706 may be the lens for judicial review, it is upon § 3621 that plaintiff

interests limitation apply most clearly where a provider of government services challenges the reduction of benefits to a third party because the reduction decreases the demand for the provider's services. Thus in cases applying the zone-of-interests test, the Supreme Court has used as a paradigm case the example of a transcript preparer who would lack standing to challenge an agency's refusal to require its hearings to be on the record as required by statute. *Nat'l Wildlife Fed'n*, 497 U.S. at 883; *see also NCUA*, 522 U.S. at 498. The example is indistinguishable from Dismas's §3621 claim. Dismas has provided no hint that halfway houses are even arguably within the zone of interests of the statute that it alleges gives BOP the option of placing prisoners in halfway houses. At most, even assuming that Dismas is right on the merits of its arguments regarding § 3621, the *prisoners*, not the halfway house itself, are within the statute's zone of interests.

It is true that the Supreme Court has found the zone-of-interests test to be particularly loose in a series of cases culminating in *NCUA*, 522 U.S. 479. *See Data Processing*, 397 U.S. 150; *Arnold Tours, Inc. v. Camp*, 400 U.S. 45 (1970); *Investment Co. Inst. v. Camp*, 401 U.S. 617 (1971); *Clarke*, 479 U.S. 388. Each of these cases involved competitors of federally chartered financial institutions challenging actions by federal regulatory agencies permitting the regulated institutions to engage in activities that hurt the competitive economic interests of the plaintiffs. *See Data Processing*, 397 U.S. 150 (agency had permitted national banks to offer data processing services); *Arnold Tours*, 400 U.S. 45 (agency had permitted national banks to provide travel services); *Investment Co. Inst.,* 401 U.S. 617 (agency had permitted national banks to operate mutual funds); *Clarke,* 479 U.S. 388 (agency had permitted national banks to offer discount brokerage services); *NCUA*, 522 U.S. 479 (agency had permitted individual federal credit unions to expand to multiple unrelated employer groups; suit brought by banks). The statutory bases for the plaintiffs' challenges in these cases were the federal statutes allegedly prohibiting the activity that the agency had permitted on the part of the federally chartered institutions. In each case the Supreme Court found competitors of the federally chartered institutions to be arguably within the zone of interests of the relevant statute, despite the absence of statutory language indicating that the purpose of the relied-upon statutory limitation was to protect the interests of competitors of the federally chartered institutions.

The dissent in *NCUA* contended that the majority's decision in that case effectively did away with the zone-of-interests test. 522 U.S. at 505-09 (O'Connor, J. dissenting). The majority, however, whose opinion we must of course follow, expressly eschewed such a conclusion. *Id.* at 494 n.7. The majority moreover distinguished rather than overruled a case in which the Supreme Court had unanimously held that postal workers were not arguably within the zone of interests of federal postal monopoly statutes. *Id.* at 498-99 (discussing *Air Courier Conference v. Postal Workers*, 498 U.S. 517 (1991)). In *Air Courier*, postal employees were not permitted to challenge a particular loosening of the postal monopoly by the Postal Service, because the purposes of the postal monopoly statute at issue were solely to increase the revenues of the Post Office and to ensure that postal services were provided in a manner consistent with the public interest. *Air Courier*, 498 U.S. at 526-27; *NCUA*, 522 U.S. at 498-99.[6] In distinguishing *Air Courier*, the *NCUA* majority explained "that although the statute in question regulated competition, the interests of the plaintiff employees [in *Air Courier*] had nothing to do with competition." 522 U.S. at 499. In short, the zone-of-interests test must still be passed, although there is something about competitor suits that makes the test easier to pass.

---

ultimately relies as a basis for relief.

[6]Our circuit has continued to apply the zone of interests test to preclude a comparable suit by government employees. *Courtney*, 297 F.3d 455 (civilian employees working at a military base held to lack prudential standing to challenge base decision to outsource work to private contractor).

Two aspects of competitor suits may form the basis for treating them with particular generosity. First, when the government enters the market by chartering specially favored or subsidized market actors, any limit on the activity of such institutions may arguably have, as an implicit purpose, the goal of not distorting the market more than necessary. Competitors would arguably be within the zone of such an interest. Second, although not formally relevant, the absence of competitor standing may render some agency actions effectively immune from judicial review. When a regulatory agency permits a regulated party to do something previously prohibited, the only party with Article III standing to challenge the government action may be the competitor. In *NCUA* for instance, the Supreme Court went on to find that the agency had clearly violated the relevant statute. *Id*. at 503. The violation would presumably have continued unabated in the absence of competitor standing.

The instant case does not involve competitor standing, and neither of the considerations just mentioned applies to Dismas. First, in giving discretion to the BOP to place prisoners in CCCs (assuming the correctness of Dismas's legal assertions that underlie its arbitrary and capricious argument), Congress was in no way limiting the market power of a subsidized market actor. In this respect the case is much closer to *Air Courier* than to *NCUA*. Dismas does not even argue that § 3621 protected the market interests of CCCs. Second, unlike in competitor cases, for this alleged violation there is a clear alternative plaintiff with Article III standing—a prisoner who is denied a placement as a result of the BOP policy. Such a prisoner is obviously much more arguably within the zone of interests of the grant of discretion said to reside in § 3621. In this respect, Dismas is much closer to the transcript preparer in the *Nat'l Wildlife Fed'n* example than to the competitor banks in *NCUA*.

Because Dismas's interests do not arguably fall within the zone of interests articulated above, we agree with the district court that Dismas lacked prudential standing under § 3621(b).

## B. Claim under § 553 of the Administrative Procedure Act

Although the district court did not separately analyze the standing of Dismas to raise its procedural claim against the BOP policy, it did dismiss all of Dismas's claims. Neither party separately addresses Dismas's standing to raise such a claim, or the merits of the claim. We of course may affirm on a ground not relied upon by the district court. *United States v. Hudgins*, 52 F.3d 115, 118 (6th Cir. 1995). While Dismas has standing to raise its procedural challenge to the BOP policy, the procedures sought by Dismas are clearly not required by the APA, and we therefore affirm on that alternative ground.

Dismas has standing to challenge the BOP policy on the ground that notice and comment rulemaking was required before the policy could be put into effect. First, Dismas has Article III standing because, as the Supreme Court explained in *Defenders of Wildlife*, "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." 504 U.S. at 572 n.7. The procedural requirements of notice and comment prior to rulemaking, assuming that they are applicable, certainly protect concrete interests of Dismas. If applicable, they give Dismas the chance to argue to the BOP that its policy is wrong before the policy is adopted, and Dismas's interest in continuing to provide services to the BOP is certainly concrete. Dismas has Article III standing to raise the § 553 argument because a plaintiff can enforce procedural rights "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8; *see also Sierra Club* v. *Glickman*, 156 F.3d 606, 613 (5th Cir. 1998).

Second, CCCs like Dismas are arguably within the zone of interests protected by the notice and comment rulemaking requirements of the APA. Prudential standing to assert procedural

protections depends on whom the procedural protections were designed to protect. *See Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1483-84 (D.C. Cir. 1994).[7] The notice and comment rulemaking requirements were intended to "assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality opinion). In addition, one of the central purposes of the requirement of notice and comment is to give those with interests affected by rules the chance to participate in the promulgation of the rules. Thus the D.C. Circuit explained in *National Soft Drink Assn. v. Block*, 721 F.2d 1348, 1353 (D.C. Cir. 1983), that the § 553 requirements ensure fair treatment for persons to be affected by regulations. Similarly, the Fifth Circuit explained in *U.S. Steel Corp. v. U.S. E.P.A.*, 595 F.2d 207, 214 (5th Cir. 1979), that § 553 is "designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage." When an agency promulgates a regulation that lessens government spending on goods or services offered by providers, those providers are squarely within the zone of interests protected by the notice and comment requirements of the APA. For instance, in *Chocolate Mfrs. Ass'n. v. Block*, 755 F.2d 1098 (4th Cir. 1985), chocolate manufacturers challenged a federal Food and Nutrition Service (FNS) rule prohibiting the use of chocolate flavored milk in the federally funded food program for women, infants and children. The Fourth Circuit held that notice and comment procedures were required, and never questioned the standing of the chocolate manufacturers to insist on such procedures under the APA. *Id.* This case is not distinguishable, and CCCs are certainly at least arguably within the zone of interests of the notice and comment rulemaking requirements of the APA. *See also Career College Ass'n v. Riley*, 74 F.3d 1265, 1276 (D.C. Cir. 1996) (colleges' § 553 challenge to change in federal student assistance regulations).

---

[7]The D.C. Circuit in *Int'l Bhd. of Teamsters* upheld the standing of a truck drivers' union to challenge a federal rule requiring the recognition of Mexican commercial driver licences. 17 F.3d at 1483-84. Two procedural challenges—ultimately rejected on the merits—were that the rule required notice and comment, and that the rule amounted to a "trade agreement" requiring specific congressional authorization. In finding prudential standing, the D.C. Circuit reasoned:

> Standing to assert procedural protections is thus derivative; a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority, at least if the procedure is intended to enhance the quality of the substantive decision. Of course, a procedure might be aimed simply at giving some special class of persons a voice, in which case the interests of persons not in that class might be "so marginally related to or inconsistent with the purposes implicit in the [requirement] that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. But the notice-and-comment provisions invoked by petitioner are not directed to any such parochial goal.

> For the same reason, we think that the petitioner has standing to contend that the Implementing Rule is invalid because the underlying Memorandum of Understanding was never endorsed by Congress in accordance with the procedures established by the trade acts. The procedural requirement that trade agreements be subject to Congress's approval presumably was designed to let Congress double check the balance that the executive's trade negotiators strike between interests of the sort that the union advances and countervailing considerations, such as consumer interests in lower-priced products. Indeed, Congress specifically identified both employment opportunity and safety as domestic objectives that the executive's trade negotiators should take into account. 19 U.S.C. § 2901(b)(9)(B).

17 F.3d at 1484. This analysis supports the proposition for which we cite the case in the text, but arguably misstates the proper analysis at one point by stating that "a party within the zone of interests of any substantive authority generally will be within the zone of interests of any procedural requirement governing exercise of that authority." As explained above, the zone-of-interests test does not require examination of the substantive authority for the challenged agency action, but of the basis for the challenge to the action. Whether the basis for the challenge is substantive or procedural, it is that basis that must be looked to in order to see whether the plaintiff is arguably within the zone of its protection.

Affirmance is nonetheless required, however, because Dismas just as clearly fails to state a claim under those requirements. The rulemaking requirements of § 553 of the APA do not apply to "interpretative rules." § 553(a).[8] Both the Thompson and Sawyer memoranda, assuming that either may be categorized as a "rule,"[9] clearly fall in the category of interpretative rule. The Attorney General's Manual on the Administrative Procedure Act, persuasive authority on the meaning of the APA, describes an interpretive rule as one "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *See Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 99 (1995) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). The difference between legislative and interpretative rules "has to do in part with the authority—law-making versus law-interpreting—under which the rule is promulgated." *Warder v. Shalala*, 149 F.3d 73, 80 (1st Cir. 1998) (*quoting Levesque v. Block*, 723 F.2d 175, 182 (1st Cir. 1983) (quotation marks omitted)). "For purposes of the APA, substantive rules are rules that create law," while in contrast "[i]nterpretive rules merely clarify or explain existing law or regulations and go to what the administrative officer thinks the statute or regulation means." *First National Bank v. Sanders*, 946 F.2d 1185, 1188-89 (6th Cir. 1991) (quoting *S. California Edison Co. v. Fed. Energy Regulatory Comm'n*, 770 F.2d 779, 783 (9th Cir. 1985)); *see also Warder,* 149 F.3d at 80 (*quoting Metro. Sch. Dist. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992)) ("[R]ules are legislative when the agency is exercising delegated power to make law through rules, and rules are interpretative when the agency is not exercising such delegated power in issuing them.").

The distinction reflects the primary purpose of Congress in imposing notice and comment requirements for rulemaking—to get public input so as to get the wisest rules. That purpose is not served when the agency's inquiry or determination is not "what is the wisest rule," but "what is the rule." The interpretative rule exception reflects the idea that public input will not help an agency make the legal determination of what the law already is. The D.C. Circuit, for instance, in applying the interpretative rule exception, has "generally sought to distinguish cases in which an agency is merely explicating Congress' desires from those cases in which the agency is adding substantive content of its own." *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987). *Cf. Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 759 (D.C. Cir. 1992) ("the 'interpretative rule' exception was designed to provide agencies with a degree of flexibility where 'substantive rights are not at stake'").

It follows that the Thompson and Sawyer memoranda, assuming that either is a rule otherwise subject to the notice and comment requirements of the APA, are paradigm examples of interpretative rules. See *Cohn v. Fed. Bureau of Prisons*, 302 F.Supp.2d 267, 274-75 (S.D.N.Y. 2004); *Skelskey v. Deboo*, 332 F.Supp.2d 485, 489-90 (D. Conn. 2004); *Fierro v. United States*, No. Crim. 01-100-SLR, 2004 WL 1454398, at *4 (D. Del. 2004). The memoranda each state that the statutory interpretation by the OLC will henceforth be implemented. The Thompson memorandum in its operative language relies specifically and directly on the unlawfulness of its previous practice

---

[8]We assume, but need not decide, that the BOP policy is not exempt under the provision of § 553 exempting "general statements of policy." *See generally Syncor International Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997) (distinguishing "general statements of policy" from "interpretative rules" for § 553 purposes).

[9]For purposes of § 553 analysis, we focus on the December 16, 2002 memorandum by Deputy Attorney General Larry Thompson and on the December 20, 2002 memorandum issued by Federal Bureau of Prison Director Kathleen Hawk Sawyer. There is no general requirement that agency policies require notice and comment. *See United States v. Cinemark,* 348 F.3d 569, 580-81 (6th Cir. 2003). Instead, the requirement applies to *rules*. In this case, the only thing that can possibly be identified as a BOP rule is the Thompson memo or the Sawyer memo. *See* 5 U.S.C. § 551 (4) ("'rule' means the whole or a part of an agency *statement . . .* " (emphasis added)). We assume without deciding that the Thompson memo or the Sawyer memo is a "rule" for APA purposes.

as determined by the OLC.[10]   Even more clearly, the Sawyer memorandum does not make any kind of policy analysis or determine what is the better, or more effective, or less burdensome, rule. Instead, the BOP changed its procedure because the "OLC . . . determined that the [BOP's] practice of using CCCs as a substitute for imprisonment contravenes well-established caselaw, and is inconsistent with U.S.S.G. § 5C1.1."  Memorandum of BOP Director Kathleen Hawk Sawyer, December 20, 2002, at 1.  Clearly, the memo simply determines what the law is, and does so by reliance upon a legal interpretation by the OLC.  Notice and comment rulemaking procedures are simply not designed as a means for agencies to improve their legal analysis.  And it is the agency's legal analysis that Dismas challenges.[11]

We recognize that some district courts have found that the BOP policy required notice and comment.  Some of these cases rely on the idea that a rule is legislative rather than interpretative if it is "binding" or "nondiscretionary," and that the BOP policy, since binding, is not interpretative. *See Monahan v. Winn*, 276 F. Supp. 2d 196, 213-14 (D. Mass. 2003); *McDonald v. Fed. Bureau of Prisons*, No. 1:03-CV-235-RWS, 2003 U.S. Dist. LEXIS 14035, at *18-19 (N.D. Ga. Feb. 14, 2003). The argument mistakes the extent to which a reviewing *court* is bound by a regulation with the extent to which an *agency* is bound.  It is true that an interpretative rule is not binding upon a court, whereas a properly authorized legislative rule is so binding.  But using that distinction, the BOP policy is interpretative, because the BOP's interpretation is not binding on reviewing courts, which may of course disagree with the government's statutory interpretation (as many have already done, *see Goldings,* 383 F.3d at 28-29; *Elwood,* 386 F.3d at 847).  An interpretative regulation is binding on an *agency*, on the other hand, not by virtue of the promulgation of the regulation (as in the case of a legislative regulation), but by virtue of the binding nature of the interpreted statute.  Such a binding nature cannot render a rule legislative, else every interpretative rule would become legislative.

Nor does the BOP memorandum lose its interpretative nature because of its substantial impact, as implied by the district court in *Iacaboni v. United States*, 251 F. Supp. 2d 1015, 1040 (D. Mass. 2003).  The policies underlying the notice and comment requirement, and the apparent reasons for the exception for interpretative rules, are unrelated to the substantial impact of a rule.  A pure statutory interpretation can have an enormous impact, yet be based entirely on statutory analysis for which public input would be of minimal value.  Our court has accordingly rejected substantial impact as a basis for determining the applicability of the interpretative rule exception. *See Friedrich v. Sec. of Health and Human Servs.*, 894 F.2d 829, 836 (6th Cir. 1990) (stating that "[t]he extent of the impact is not an indicative factor" in characterizing the nature of a rule); *Sanders*, 946 F.2d at

---

[10]The memorandum does add a policy consideration in favor of the change in policy—the risk of inappropriately favorable treatment of white collar criminals under the previous interpretation—but the operative determination to change BOP practice is clearly based on the statutory interpretation made by the OLC.

[11]In *Gordon v. Shalala*, 55 F.3d 101 (2d Cir. 1995), the Second Circuit came to a similar conclusion in a case involving a determination by the Secretary of Health and Human Services to acquiesce in a Second Circuit opinion:

> plaintiff claims that the *Ruppert* Acquiescence Ruling had to have been publicly promulgated pursuant to the Administrative Procedure Act (the "APA") in order to be effective. This argument is frivolous. The general rule on acquiescence rulings is that although they "do not have the force and effect of law, they constitute Social Security Administration interpretations of its own regulations and the statute which it administers . . . . The *Ruppert* Acquiescence Ruling was interpretive, not substantive. It did not create rights or impose obligations. It merely interpreted this Court's mandate in *Ruppert* to the effect that imputed income must provide the SSI recipient with an "actual economic benefit."  It was not subject to the notice and comment requirements of the APA.

55 F.3d at 105.

1189 (noting that "the substantive impact test . . . has been disfavored recently by [the Sixth Circuit] and other courts").  *See also Alcaraz v. Block*, 746 F.2d 593, 613 (9th Cir. 1984) (rejecting the argument that "for the purposes of imposing notice and comment requirements on the agency for a particular rule, we look to the 'substantial impact' of the rule").

Finally, the rule is not legislative simply because it departs from the BOP's prior interpretation of § 3621, as implied in cases such as *Howard v. Ashcroft*, 248 F.Supp.2d 518, 536 (M.D. La. 2003), and *McDonald*, 2003 U.S. Dist. LEXIS 14035, at *18-19.  As the Second Circuit has explained clearly,

> an interpretive rule changing an agency's interpretation of a statute is not magically transformed into a legislative rule.  If the rule is an interpretation of a statute rather than an extra-statutory imposition of rights, duties or obligations, it remains interpretive even if the rule embodies the Secretary's changed interpretation of the statute.

*White v. Shalala*, 7 F.3d 296, 304 (2d Cir. 1993) (citations omitted).   Other circuits agree that "a new position does not necessarily make a rule legislative rather than interpretive." *Metropolitan School Dist. v. Davila*, 969 F.2d 485, 490 (7th Cir. 1992) (citing as authority *State of Michigan v. Thomas*, 805 F.2d 176, 182-84 (6th Cir. 1986); *Alcaraz*, 746 F.2d at 613-14; and *American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 559-60 (D.C. Cir. 1983)).  This court accordingly has held that certain provisions of the Medicare Provider Reimbursement Manual were interpretative and therefore not subject to notice and comment despite the plaintiff's argument in that case that the provisions had changed: "We also find unpersuasive St. Francis's argument regarding the Secretary's 'inconsistent' interpretation of its regulations. As this Court has stated, '[a]dministrative agencies are not bound by their own prior construction of a statute . . . .'" *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 947-48 n. 11 (6th Cir. 2000) *(quoting Crounse Corp. v. ICC*, 781 F.2d. 1176, 1186 (6th Cir. 1986)).

It is true that once an agency gives a *regulation* an interpretation, notice and comment will often be required before the interpretation of that regulation can be changed.  *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001); *Alaska Prof'l Hunters Ass'n v. Fed. Aviation Adm'n*, 177 F.3d 1030, 1033-34 (D.C. Cir. 1999).  This is because once an agency has promulgated its own regulation, a change in the interpretation of that regulation is likely to reflect the agency's reassessment of wise policy rather than a reassessment of what the agency itself originally meant.  The determination of wise policy—unlike legal interpretation—is the kind of determination for which notice and comment procedures are particularly appropriate.  However, when an agency is changing its interpretation of a *statute*, it is much more likely that the agency is not trying to determine what is the wiser rule, but rather what *is* the rule.  Thus, in *Alaska Hunters*, the D.C. Circuit explained that "an agency has less leeway in its choice of the method of changing its interpretation of its regulations than in altering its construction of the statute" because "'[r]ule making,' as defined in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of modifying a rule."  177 F.3d at 1034.  Agencies in contrast cannot modify a statute, and *statutory* interpretation can therefore more easily be distinguished from legislative rulemaking.  This is particularly so where, as here, the agency's change in interpretation resulted from an opinion by the OLC concluding that the agency's interpretation of the statute was unlawful.

We take no position on the merits of Dismas's legal challenge to the BOP policy.  We hold only that, under the interpretative rule exception, a rule that embodies a pure legal determination of what the applicable law already is does not require notice and comment under APA § 553(b).

Because Dismas's claim based on § 553 of the APA fails as a matter of law, the district court properly dismissed that aspect of Dismas's case as well.

     For the foregoing reasons, we AFFIRM the judgment of the district court.